Ernesto BATTLE, Appellant,

v.

UNITED STATES, Appellee.

Jose DIAZ, Appellant,

v.

UNITED STATES, Appellee.

Luis RODRIGUEZ, Appellant,

v.

UNITED STATES, Appellee.

Nos. 83–1555, 84–39 and 84–760.

District of Columbia Court of Appeals.

Argued Feb. 11, 1986.
Decided Oct. 3, 1986.

---

Keith Teel, Washington, D.C., for appellant Battle.

Robert Weiner, Washington, D.C., for appellant Diaz.

Warner W. Gardner, with whom Richard M. Wyner, Washington, D.C., was on brief for appellant Rodriguez.

T. Mark Flanagan, Jr., Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Steven C. Tabackman, and Michael W. Farrell, Asst. U.S. Attys., Washington, D.C., were on brief for appellee.

Before NEBEKER and NEWMAN, Associate Judges, and PAIR, Senior Judge.

NEWMAN, Associate Judge:

To resolve this appeal, we must decide four issues of first impression with this court: (1) can a conviction under D.C. Code § 22-503 (1981) for assault with intent to commit another offense be based upon an intent to commit the other offense against another person; (2) does the extortion statute of the District of Columbia, D.C. Code § 22-2306 (1981), apply to a communication originating outside the District of Columbia but transmitted and received here; (3) does the trial court have discretion to permit rebuttal evidence as to a defendant who presented no witness or evidence in defense; and (4) is an aider and abettor subject to sentence enhancement under D.C. Code § 22-3202 (1981) because a codefendant was armed with a pistol while committing the offense? We answer each question in the affirmative and affirm all the convictions.

Battle, Diaz and Rodriguez were tried and convicted of various offenses arising out of their attempts to collect for a sizeable quantity of cocaine which had been consigned to Cesar Kelley for resale.[1] We

---

1. Battle was convicted of kidnapping while armed, D.C. Code §§ 22-2101, -3202 (1981); three counts of assault with intent to kidnap while armed, D.C. Code §§ 22-2101, -503, -3202 (1981); two counts of communicating a threat, D.C. Code § 22-2306, and assault with a dangerous weapon, D.C. Code § 22-502 (1981). He was sentenced to imprisonment of twenty-one years to life. Diaz was convicted of kidnapping while armed, two counts of assault with intent

set forth hereafter only those facts pertinent to the four issues outlined above which we deem merit discussion and analysis.[2]

## I. Facts

### A. The Kidnapping of Ceasar Kelly[3]

On the afternoon of June 9, 1982 Caesar Kelly and his two-year old son, Daniel, were enroute by car from Kelly's mother's house when appellants Battle and Diaz approached the car. The car was stopped in traffic near Irving Street, Northwest.[4] Diaz approached the car on the driver's side; Battle proceeded to the passenger side, opened the door, displayed a pistol, entered the car, and announced in Spanish, "I'm the 'Pequeno' [little man] from Miami and I'm here to collect."[5] Simultaneously, Diaz forced entry into the driver's side of the car and positioned himself in the back seat. Battle ordered Kelly to follow the car with New York tags in front of him.[6] Kelly followed the lead car to a nearby church parking lot where he was instructed to park his car. Battle and Diaz ordered Kelly and his son to get out of the parked vehicle and enter the lead car, which was already occupied by two additional comrades of Battle. The lead car then proceeded to a motel in Maryland where Battle and his confederates rented a room. Kelly and his son were taken to the rented room where, at the discretion of Battle, Kelly telephoned his wife, Angel Rice, informing her that he and the child were being held

---

to kidnap while armed, and two counts of communicating a threat. He was sentenced to a term of imprisonment of from twelve years to life. Rodriguez was convicted of two counts of assault with intent to kidnap while armed; assault with a dangerous weapon; and communicating a threat. He was sentenced to imprisonment from fifteen years to life.

2. Many of the contentions raised by Battle, Diaz and Rodriguez merit little discussion. Specifically, we find no merit to Battle's contentions that reversible error was committed by the trial court: (1) in admitting "other crimes" evidence; see e.g., Gates v. United States, 481 A.2d 120, 123 (D.C.1984), cert. denied, 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985); (2) by denying his motion for acquittal on two assault with intent to kidnap while armed counts, assault with a dangerous weapon, and communicating a threat, see generally United States v. Hubbard, 429 A.2d 1334 (D.C.), cert. denied, 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981); (3) by refusing his requested lesser included offense instruction, see Robinson v. United States, 388 A.2d 1210 (D.C.1978); and (4) in failing to give, sua sponte, an instruction of testimony of an accomplice, Angel Rice. See Tabron v. United States, 410 A.2d 209, 214–15 (D.C.1979). We also reject Battle's contention that the court erred in sentencing him.

We reject Diaz's claim that his convictions must be reversed because: (1) of insufficient evidence to sustain certain of his convictions, see generally United States v. Hubbard, supra, and (2) the trial court's refusal to give a lesser included offense instruction; see Robinson v. United States, supra.

We likewise reject Rodriguez's claim that his convictions should be reversed because of: (1) evidentiary insufficiency, see generally United States v. Hubbard, supra; (2) the court's failure to instruct, sua sponte, on accomplice testimony as to Angel Rice, see Tabron v. United States, supra; (3) by giving only the standard instruction on identification of the perpetrator, see Smith v. United States, 343 A.2d 40 (D.C.1975); (4) ineffective assistance of counsel, see Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); plain error resulting from prosecutorial misconduct during closing argument, see Streater v. United States, 478 A.2d 1055 (D.C.1984) (counsel may make reasonable comments on the evidence and draw from it all reasonable inferences); Sherrod v. United States, 478 A.2d 644 (D.C.1984) (counsel is permitted to respond in his own argument to claims advanced by opposing counsel); (5) refusal to a lesser included offense instruction, see Robinson v. United States, supra; and (6) his right to fair trial was abridged by the evidence of other crimes admitted against Battle.

3. The course of events discussed in this subsection formed the basis for the following counts of the indictment: kidnapping Caesar Kelly while armed; assaulting Kelly's son, Daniel, while intending to kidnap Kelly; and communicating a threat to Kelly's wife, Angel Rice.

4. Kelly made an in-court identification of Diaz. He had previously identified him from a photograph of one of the July 1982 lineups.

5. The "collection" which Battle sought was repayment for a sizeable amount of cocaine cosigned to Kelly by Battle's business partner, Antonio Chapotin, for resale.

6. Kelly later identified a car seized at the time of appellants' arrests as the car used to kidnap him.

and that she had forty-eight hours to come up with $11,000 for their release.[7] Kelly and his captors remained in the motel room for three to four hours, during which time he was informed that everything would be okay "as long as the money showed." At one point, Battle left the room and handed the gun to Diaz who remained in the room to keep watch over Kelly and his son.

Some time after the first call, Ms. Rice received another call informing her that Kelly's captors planned to return the son, Daniel, to her; she was directed to stand outside of her apartment building so that she could pick up the boy when he was dropped off. Kelly and his captors (Battle, Diaz, Garcia, and Gonzales) left the motel and proceeded to Kelly's apartment. Once they reached the building, Battle and Gonzalez met Rice outside and returned Daniel to her; Kelly remained in the car under force. Battle and Gonzales re-entered the car, whereupon Ms. Rice attempted to approach the car as it sped off. She saw five men in the car, three of whom—Garcia, Gonzales, and, of course, Kelly—she already knew. In addition, she also observed Battle and Diaz whom she later identified in court, and noted that the car had New York tags.

Thereafter, the captors drove Kelly to a rowhouse in Brooklyn, New York. They entered the basement of the house, where Kelly remained—only once venturing upstairs—until Friday evening, June 11, approximately two days later. During this time, several phone calls were made to Rice inquiring about the ranson. When Rice informed the captors that she had come up

with $8000.00, Battle decided to return to Washington to collect the money upon a promise from Kelly that he would pay the remainder as soon as possible.

The next day, Battle, Diaz, and two additional men, Luis Rodriguez and Felix Santiago, drove back to Washington with Kelly. Meanwhile, Gonzales called Ms. Rice to inform her where the exchange of the money for her husband was to occur. As arranged, Battle arrived at the destination and Rice gave him the $8000.00; she then departed and met Kelly at the location where he had been left by his captors.

### B. The Attempted Kidnapping of Carlos Vitorino [8]

As there was still a balance of money outstanding for the cocaine given to Kelly, Battle decided to approach Carlos Vitorino for repayment.[9] Battle, Diaz, Rodriguez and another confederate named Felipe Pillot,[10] visited Kelly's home on several occasions to insist that Kelly lead Battle to Vitorino. Kelly, who was aware that Vitorino was a reserve policeman, told Battle that he did not want to participate in retrieving any money from Vitorino. During one of the visits to Kelly's home, Pillot told Kelly's wife, Angel Rice, to write a "ranson note" for the planned kidnapping of Vitorino. Thereafter, Battle and his confederates returned to Kelly's house and insisted that either Kelly or Rice accompany him to Vitorino's home. Ms. Rice accompanied Battle involuntarily because she noticed that Battle was armed with a gun. Upon reaching Vitorino's apartment, Rice gained

---

7. This specific communication constituted the count charging communication of a threat to Ms. Rice.

8. The events discussed in this subsection formed the basis for the following counts of the indictment: assaulting Carlos Vitorino with intent to kidnap him; assaulting Vitorino's fiance, Lisa, while intending to kidnap Vitorino; and assaulting Carlos Vitorino with the intent to kill him while armed.

9. When Kelly purchased the cocaine, he left a large amount of the substance with his friend

Vitorino to resell while Kelly went on vacation for a few weeks. Vitorino by virtue of use of cocaine and consequent hallucinations flushed the unused cocaine down the toilet. At the time of Kelly's kidnapping Kelly owed $11,000 for the cocaine; after payment of the ransom the balance owed was $3,000.

10. Felipe Pillot was also originally indicted with the appellants. However, on the eve of trial he pled guilty to two counts of assault with intent to kidnap while armed and one count of communication of a threat.

entry for herself, Battle, Rodriguez and an unidentified third individual. Battle and Rodriguez, who were both armed, pulled Vitorino out of the bed at gunpoint and demanded payment. Vitorino's fiance, Lisa, who was present in the apartment, became hysterical during the incident. Acting on orders from Battle to "shut-up" Lisa, Ms. Rice pushed Lisa into the bathroom, struck her, and tied her up. Meanwhile, Battle and the others escorted Vitorino out of the apartment. When Vitorino reached the exit he was able to break away and run down the corridor. As he looked back, he saw Battle point and shoot a pistol at him; however, the shot missed him. The group departed without Vitorino or the money.

## C. *The Extortion Attempt* [11]

Following the unsuccessful kidnap attempt upon Carlos Vitorina, Battle and his group made several attempts to communicate with the Vitorino family. One of Battle's comrades, Pillot, visited the home of Carlos' parents and informed Carlos' father that Carlos owed a $20,000 debt for an amount of cocaine. Pillot returned to the Vitorino home later that same day where he gave a note [12] to Carlos' brother and informed the Vitorino family that the persons seeking to "collect" were serious and that if Carlos did not cooperate they were going to do the same thing to Carlos that they did to Kelly. Pillot also told the Vitorino's that the family would suffer unless they came up with the money in forty-eight hours. The Vitorino's received several telephone calls over the next few days from Pillot reiterating his threats and emphasizing the urgent need for payment. During one of the conversations, a detective, posing as Carlos Vitorino's brother, set up a meeting with Pillot for payment of

the money and for a drug transaction. Battle, Diaz, Pillot and others were arrested at or near the site of the meeting.

## II

D.C. Code § 22–503 provides as follows:

> Whoever assaults another with intent to commit any other offense which may be punished by imprisonment in the penitentiary shall be imprisoned not more than 5 years.

Pursuant to an indictment based upon § 22–503, Battle was convicted of assaulting Daniel Kelly with intent to kidnap Cesar Kelly while armed. Additionally, Battle and Rodriguez were convicted of assaulting Lisa Vitorino with intent to kidnap Carlos Vitorino while armed. Both appellants claim that their convictions under § 22–503 require reversal because that section does not contemplate prosecution unless the intent to commit the "other offense" (i.e., kidnapping) is directed to the person assaulted. Conversely, the government correctly points out that neither the language of § 22–503 nor any legislative purpose underlying its creation compel an interpretation requiring that the other offense intended must be directed against the same person as the assault.

■ This court recently examined a similar issue in *Moore v. United States,* 508 A.2d 924 (D.C.1986). In *Moore,* the appellant was convicted under D.C. Code § 22–501 of assault upon "A" with intent to rob "B". We held that while neither the language of the statute nor its legislative history address the propriety of such a charge, "common sense and evident statutory purpose" persuaded this court to conclude that the charge and subsequent conviction were proper. *Id.* at 925–26. We

---

11. The events discussed in this subsection formed the basis for the count charging communication of a threat to members of the Vitorino family.

12. The note contained the following message: Dear Carlos, If you don't want this thing to go any further, you have forty-eight hours to pay up the money you owe. This bill is $20,000. *And, if you're wondering who's writing this I'm the same one as Saturday night.* (Emphasis added).
This specific communication constituted the court charging communication of a threat.

rely upon the *Moore* rationale to resolve the issue now before this court. Appellant's argument that the assault and its aggravating intent to commit another crime must be directed to the same person would frustrate the purpose of § 22–503 in instances where, as here, a defendant assaults one victim with the intent to effectuate the commission of another crime against a second victim. There is clearly a most compelling societal interest in curbing such conduct, and § 22–503 provides the means to do so.

### III

■ Appellant Diaz and Battle contend that their convictions for communication of a threat to Angel Rice must be reversed because the extortion statute, D.C. Code § 22–2306,[13] is inapplicable to the instant facts—the communication of a threat by phone from a hotel in Maryland into the District of Columbia. Section 22–2306 reads in pertinent part:

Whoever with intent to extort from any person, firm, association, or corporation, any money or other thing of value:

(1) Transmits within the District of Columbia any communication containing any demand or request for ransom or reward for the release of any kidnapped person, shall be fined not more than $5,000, or imprisoned not more than 20 years, or both....

Appellants argue that the phrase "transmits within" establishes a jurisdictional requirement that the transmission of the communication occur in the District of Columbia in order for prosecution to be pursued under § 22–2306. We disagree with such a restrictive interpretation of this particular extortion statute. To "transmit" is "*to send or transfer from one person or place to another, or to communicate.*"

Black's Law Dictionary 1344 (5th ed. 1979). The transmission in the present case consisted of the utterance of the ransom demand in Maryland and the communication of the demand to Angel Rice in the District of Columbia. Because the communication terminated in the District, a part of it was in fact transmitted "within" the District. Appellants' claim that the communication must begin and end with the District is an unnecessarily restrictive interpretation of the statutory language.[14]

Moreover, appellants' attempt to distinguish *United States v. Baish*, 460 A.2d 38 (D.C.1983), is unpersuasive. In *United States v. Baish*, this court interpreted the jurisdictional scope of a similar District statute prohibiting threatening telephone calls. We held that prosecution could be maintained for a call received in the District of Columbia, notwithstanding an absence of proof that the calls were placed within the District. The court reasoned that the offense of a threatening telephone call consisted of both utterance and communication of the threatening language; regardless of where the threats originated, they could not "threaten" until they had been communicated to someone and therefore, the receipt of such threats in the District of Columbia was a sufficient basis upon which to predicate subject matter jurisdiction. *Id.* at 41–43. The reasoning of the court in *Baish* is applicable here: a necessary component of the transmitted communication was its receipt—without receipt, no transmission occurs. Because it has been established that part of the component of a "transmission" (i.e., receipt) occurred in the District, there is an adequate basis for prosecution. Accordingly, we hold that, if a transmitted communication for ransom or kidnap reward is received by someone in the District of Colum-

13. D.C. Code § 22–2306 has since been amended and recodified as § 22–3851.

14. Appellants' contention that federal law may overlap District of Columbia law in restricting such transmissions has no bearing upon the ability of the United States Attorney to prose-

cute. Many statutes overlap in their coverage; the decision as to which of several applicable statutes will form the basis for an indictment and prosecution is within the discretion of the United States Attorney. *Davis v. United States*, 385 A.2d 757, 759 (D.C.1978).

bia, the transmitor is within the proscriptive ambit of § 22–2306 regardless of from where the communication originates.

## IV

Appellant Diaz contends that his conviction must be reversed because the trial court erred in allowing the government to present rebuttal evidence against him when he had presented no evidence in his own defense. A review of the pertinent facts compels us to disagree.

When trial commenced, Diaz, Battle, Rodriquez and Gonzales were joined as defendants. During opening statements, counsel for Diaz stated that the evidence would show that Diaz, although possibly present during the alleged kidnapping of Kelly, had no knowledge that such a criminal act was occurring. He further stated that the evidence would demonstrate that Kelly and Rice were responsible for the attempted kidnapping of Vitorino, not appellants. Counsel for both appellants Battle and Rodriguez echoed a similar account of the facts during their opening statements. Counsel for Gonzales stated that Gonzales was going to testify that a kidnapping had occurred, but that he had participated under duress imposed by Battle and his accomplices.

The trial court severed Gonzales from the proceedings at the close of the government's case in response to Gonzales' protestations that his defense conflicted with his codefendants. Thereafter, the remaining defendants (appellants herein) presented their defenses. Rodriguez presented several witnesses who testified that Battle and Diaz were in New York when the Vitorino assault allegedly occurred in the District of Columbia. Additionally, Battle testified and exculpated himself and Diaz of all crimes. Diaz cross-examined the witnesses presented by Battle, seeking primarily to emphasize his "theory" of the case that Diaz had no knowledge of the criminal activity that occurred. Thereafter, Rodriguez presented his defense; Diaz rested without presenting any evidence.

Upon the conclusion of the defense evidence, the government announced that Gonzales would testify as a government rebuttal witness. Counsel for Diaz objected, arguing among other things, that such testimony was improper as to Diaz since he had presented no evidence. We disagree.

██ The record makes clear that Gonzales was unavailable as a government rebuttal witness until such time as he was severed as a defendant in the proceedings. The testimony given by Gonzales during rebuttal consisted of an account of who was present when the call was made to Angel Rice demanding ransom for the release of Kelly. Gonzales testified that Diaz was nearby when the call was transmitted, and that Diaz was present when Battle received payment of the ransom. Gonzales also testified regarding a jailhouse conversation with Battle and Diaz in which Battle placed himself and Diaz at the scene of the attempt to kidnap Vitorino. Following the conclusion of the government's rebuttal testimony, the court offered appellants the opportunity to present surrebuttal evidence, which they declined. Diaz now claims, as he did in the trial court with no success, that it was improper for the trial court to allow the government to present rebuttal evidence against him where he presented no case-in-chief. He also argues that the testimony regarding the jailhouse conversation was improperly admitted as an adoptive admission of Diaz.

In the usual case, "[r]ebuttal evidence refutes, contradicts, impeaches, or disproves an adversary's evidence." *Beynum v. United States*, 480 A.2d 698, 704 (D.C. 1984) (citations omitted). However, the question of whether rebuttal evidence may be admitted against a codefendant who has presented no case, where such evidence is admissible against at least one of the remaining defendants who have put on evidence, is a novel issue in this jurisdiction. In aid of our endeavor to fashion a rule, we turn to the seventh circuit's analysis of this particular issue in *United States v. Papia*, 560 F.2d 827 (7th Cir.1977). The factual

circumstances of *Papia* are quite analogous to the instant case. The appellants (four) were tried and convicted of various criminal offenses. On appeal, one of the appellants maintained that the district court erred in admitting evidence against him after he had rested without presenting any evidence on his own behalf. The Court of Appeals rejected appellant's contention, holding that it was not error to admit evidence in rebuttal against a defendant after he had rested without offering any evidence in his own behalf where the evidence, at a minimum, constituted proper rebuttal evidence against his codefendants. *Id.* at 848–49. In reaching its holding, the court noted that the appellant had favorably benefited from the testimony of other defense witnesses, and had conducted favorable cross-examination of his codefendant. *Id.* at 848–49 n. 16. Thus, the court determined that the contested rebuttal testimony could "be deemed proper rebuttal of evidence favorable to [appellant] brought out on direct and cross-examination of other witnesses." *Id.*

Finding this portion of the rationale set forth by the court in *Papia* reasonable and squarely on point with the issue presented before us here, we conclude that the trial court did not err in allowing Gonzales' rebuttal testimony to be admitted against Diaz.[15] Battle, Diaz's codefendant, presented evidence which purported to exculpate both himself and Diaz. The government's rebuttal testimony from Gonzales, referring to the jailhouse conversation where Battle placed himself and Diaz at the scene of the attempted kidnap of Vitorino, was admissible to rebut Battle's alibi evidence and as such was properly admissible against codefendant Diaz even though he did not present a case-in-chief. *Papia, supra,* 560 F.2d at 848–49. Moreover, we may conclude from Diaz's favorable cross-examination of Battle and other defense witnesses that the contested rebuttal testimony was "proper rebuttal of evidence favorable to [Diaz] brought out on ... cross-examination of other witnesses." *Id.* at 848 n. 16.[16] Finally, we reject the contention that the trial court's allowance of Gonzales' testimony during the rebuttal stage of the proceedings worked a tactical disadvantage against Diaz. As previously noted, the record reveals that Gonzales was not amenable to the government until severance was granted at the close of the government's case-in-chief; therefore, it was not possible for the government to have called Gonzales during its case-in-chief. In light of such, we find no error to have occurred against Diaz by the government's decision to introduce Gonzales' testimony during rebuttal as opposed to making a motion to reopen its case-in-chief.[17] Accordingly, we conclude that the trial court acted well within its discretion in admitting the rebuttal evidence against Diaz.

## V

Appellant Diaz contends that the sentences for his convictions for offenses committed while armed (first, second, and fifth Counts) were improperly enhanced pursuant to D.C. Code § 22–3202 (1981). We disagree. Section 22–3202 prescribes increased punishment for one who commits a violent crime while armed or where the

15. We need not, and thus do not, adopt the portion of the *Papia* rationale dealing with the trial court's discretion to permit the government to re-open its case in chief.

16. The cases cited by Diaz in support of his argument to the contrary are easily distinguishable. *See, e.g., United States v. Hall,* 653 F.2d 1002, 1004–07 (5th Cir.1981) (involved a sole .defendant who had presented no evidence and had cross-examined *government* witnesses regarding their credibility); *United States v. Delk,* 586 F.2d 513, 516, 519 (5th Cir.1978) (single defendant case where defendant presented evidence); *United States v. Pantone,* 609 F.2d 675, 680–84 (3d Cir.1979) (multiple defendant case where all defendants presented evidence and government's evidence did not rebut favorable defense statements or evidence).

17. We also reject Diaz's contention that the trial court erred in admitting Gonzales' testimony (regarding the jailhouse conversation) as an adopted admission against Diaz. *See United States v. Yates,* 173 U.S. App. D.C. 308, 311, 524 F.2d 1282, 1285 (1975).

person has a firearm "readily available." Diaz's attempt to argue that the enhancement statute applies only to an armed principal offender and not to an aider and abettor who was not armed during the offense is unpersuasive. Under D.C. Code § 22–105 (1981), one who advises, incites, connives at the offense or aids and abets the principal offender in its commission, must be charged as a principal. An individual who aids and abets the commission of a felony is legally responsible for all acts of the other person which are in furtherance of the common purpose, design or plan to commit the felony, or which are the natural or probable consequence of the act intended. *Christian v. United States*, 394 A.2d 1, 48 (1978), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979); *Johnson v. United States*, 386 A.2d 710, 713 (D.C. 1978); *see also United States v. Heinlein*, 160 U.S. App. D.C. 157, 167, 490 F.2d 725, 735 (1973). There is no indication in the D.C. Code, or any case law of this jurisdiction, to suggest that the principles enunciated in section 22–105 do not apply to enhance the sentence of an aider and abettor who assists an armed principal. The purpose for which D.C. Code § 22–3202 was designed—to deter the increasing number of armed crimes within the District—would not be served by imposing lesser sentences on aiders and abettors of armed principles. Accordingly, we conclude that under D.C. Code § 22–3202, Diaz, as an unarmed aider and abettor is subject to sentence enhancement where the principal was armed.

*Affirmed.*