**Douglas LLOYD and Earl Thurston, Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 99–CF–1097, 99–CF–1167.**

District of Columbia Court of Appeals.

Argued June 25, 2002.
Decided Sept. 26, 2002.

Dennis M. Hart, Washington, DC, for appellant Lloyd.

Nathan I. Silver, Bethesda, MD, for appellant Thurston.

Ann K.H. Simon, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Deborah L. Sines, and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, RUIZ, and GLICKMAN, Associate Judges.

FARRELL, Associate Judge:

These appeals present primarily the issue of whether the transferred intent doctrine, firmly embedded in our jurisprudence, permits a first-degree murder conviction for the shooting death of an unintended victim when the intended victim has also been shot dead. Appellants argue that where the crime intended—here premeditated murder—has actually been committed against the intended victim, the evidence of intent is insufficient to permit a second conviction for first-degree murder. In keeping with strong indications in our prior decisions and unpersuaded that the reasoning appellants urge for limiting the reach of the doctrine applies to the facts of this case, we uphold its application here. We reject appellants' other assignments of error as well, and so affirm their convictions each for two counts of first-degree murder while armed and related weapons offenses.

## I.

The essential facts are not in dispute. One of the eventual victims, John McKinney, came upon a group of men playing dice on the corner of Seaton Place and North Capitol Street, N.E. Appellant Thurston was one of the players. McKinney, who was an outsider to the group and

the neighborhood, was allowed to join the game briefly, but a short while later a man nicknamed Black Back appeared to strike McKinney, and Thurston "had some words" with him. Apparently frightened, McKinney reached into his shoulder bag, which caused most of the other participants, fearing he had a gun, to take off at a run. Although McKinney produced only a beer from the bag and began to walk away, Thurston continued to holler at him.

As McKinney walked south on North Capitol Street, Thurston told two women nearby to "leave from the corner" because "something was about to happen." One of the women, who had been observing events, understood the target of the threatened "something" to be McKinney and hoped he would "get[ ] away." At this point, appellant Lloyd's automobile came "flying through the alley" nearby and parked near the intersection of North Capitol and S Streets. Thurston left the women and joined Lloyd, who exited his car and put on a dark tee-shirt and hat over his clothes. As the two men conferred, Lloyd pulled a gun from his waistband and held it in his right hand. They then hurried together to the intersection, where Thurston pointed south in McKinney's direction and said, "[H]e's down that way." The defendants ran together in that direction.

McKinney meanwhile crossed North Capitol Street and encountered Geneva Hall, to whom he offered to sell food stamps. When Hall showed interest, McKinney put his bag on the ground and rummaged in it. As he stood upright again, Thurston and Lloyd were both "up on him" seven to nine feet away. Lloyd, holding his gun in the "sideways" position, opened fire and struck McKinney three times in the back with hollow-nosed bullets. Two of the bullets passed through McKinney's body into Ms. Hall's body. Both McKinney and Hall died.

Immediately after the shooting, Lloyd ran from the scene and, as he did, removed the dark shirt and hat he had donned minutes earlier. He jumped into a friend's truck and drove or was driven away, but returned to the scene later dressed in the clothes he had worn earlier—without the dark shirt and hat.

Thurston later gave a statement to the police which, as redacted at trial, confirmed that a "dude" had joined the crap game in which Thurston was participating, and got into a dispute with a third participant who then sought Thurston's help. Thurston obliged by securing the help of a fourth person who, after conferring with the others, left the scene briefly but returned with his car. That person retrieved a gun from the car and, accompanied by Thurston, crossed North Capitol Street where Thurston "pointed to [the dude]" and the other man "ran up and shot him."

## II.

We consider first appellants' challenge to application of transferred intent. The doctrine, besides being "well entrenched in [the] common law," has been contained "within the body of criminal law for the District of Columbia" ever since "the critical time of Maryland's cession of the District." *O'Connor v. United States,* 399 A.2d 21, 24–25 (D.C.1979). In the present case involving charges of first-degree murder, the trial judge instructed the jury on the doctrine as follows:

> [I]n an instance where a person purposely and with deliberate and premeditated malice kills one person but by mistake or inadvertence kills another person as well, the law transfers the intent from the object of the intended victim and includes the unintended victim as well.

Thus, if a person directs deadly force at another with the intention of killing

him and such killing is premeditated, deliberated and committed with specific intent to kill, and a bystander or another is also killed, the person so committing such offense may be found guilty of murder in the first degree without regard ... to whether the killing of the unintended victim was due to mistake or recklessness in the aim of the person doing the killing.

At trial, appellants did not object to these instructions or to application of the doctrine to this case. They argue nonetheless that "this is not an appropriate case for application of the theory of transferred intent" because the person Lloyd intended to kill—McKinney—was in fact killed. Invoking what amounts to a policy argument, appellants rely on language in *Ford v. State*, 330 Md. 682, 625 A.2d 984 (1993), to reason that because a key purpose of the doctrine is to insure that a shooter does not escape liability for murder because of a "bad aim," once "the crime intended has actually been committed against the intended victim, transferred intent is unnecessary and should not be applied to acts against unintended victims." *Id.* at 998 (quoted in *Ruffin v. United States*, 642 A.2d 1288, 1294 (D.C.1994)).[1] Appellants maintain that they preserved this issue for appeal by their motions for judgment of acquittal alleging that the government had not proved that they had the specific intent to kill Geneva Hall.

## A.

The government responds first that, notwithstanding the motions for judgment of

acquittal (none of which mentioned the supposed inapplicability of transferred intent), appellants' failure to object to the transferred intent instruction compels us to review their claim on appeal under the plain error standard, a test appellants concede they could not meet. *See United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). The government relies on *Brooks v. United States*, 655 A.2d 844 (D.C.1995), for this conclusion. There, in a case involving three charges of assault with intent to commit murder while armed, the trial court had permitted the jury to "transfer" the defendant's specific intent to murder one victim to the act of assaulting the two unintended victims. On appeal the defendant made the same argument appellants make against application of the doctrine, but this court found "decisive" the fact that no objection had been made to the giving of the transferred intent instruction, *id.* at 847, with the result that "appellant's claim of instruction error must be reviewed under plain error standards." *Id.* Lloyd and Thurston, by contrast, argue that our recent decision in *Newby v. United States*, 797 A.2d 1233 (D.C.2002), teaches that a general motion for judgment of acquittal preserves unspecified challenges to the sufficiency of the evidence, *see id.* at 1238, and that we applied this principle in *Newby* to reject the government's argument for plain-error review of claims concerning the reach of a particular statute that were analogous to their argument about application of transferred intent.[2]

---

1. In *Ruffin*, although acknowledging the limitation stated by the Maryland court in *Ford*, this court had no occasion to consider the soundness of it because the intended victim in *Ruffin* had not been killed. *See* 642 A.2d at 1295.

2. In *Newby*, the appellant argued that the misdemeanor simple assault statute did not encompass assaults by parents on their own

children, and that in any case the statute did not apply to parent-child assaults unless the government proved malice on the parent's part. 797 A.2d at 1236. Neither claim had been raised specifically in the trial court, but we held that "each ... is in reality a challenge to the sufficiency of the evidence to sustain [the] conviction," preserved by the general motion for judgment of acquittal. *Id.* at 1237.

*Brooks*, of course, is closer to this case factually than *Newby*, although in *Brooks* it does not appear that the appellant argued to this court that a motion for judgment of acquittal preserved the objection to application of transferred intent; nor indeed is it evident that a Rule 29 motion had been made (though we might assume it had from the fact that we considered the appellant's separate claim of insufficiency of the evidence, *see* 655 A.2d at 845–46). But we see no need here to pursue the issue of standard of review further. The government does not vigorously press the plain error standard, as it goes on to address the merits "[t]o the extent that the defendants' argument properly may be viewed as ... challenging the sufficiency of the evidence." And our disposition of the merits allows us to leave any tension between *Brooks* and *Newby* for resolution another time.

**B.**

The government asserts with considerable force that *Hunt v. United States*, 729 A.2d 322 (D.C.1999) (per curiam), previously rejected appellants' argument against application of transferred intent when the intended victim has been killed. In that case, the defendant was convicted of two counts of second-degree murder (as a lesser included offense of premeditated murder) on jury instructions that included transferred intent. On appeal he argued that, instead of transferred intent, the jury should have been permitted at most to

consider principles of "concurrent intent," *see Ruffin*, 642 A.2d at 1298, in a case where both the intended and unintended victims had died.[3] We held, to the contrary, that "the trial court committed no error in instructing the jury on transferred intent," *Hunt*, 729 A.2d at 325, explaining:

> This court has not limited the application of the doctrine of transferred intent where the intended victim is murdered. *See Brooks v. United States*, 655 A.2d 844, 849 (D.C.1995). Furthermore, despite the dicta set forth in *Ford* [*v. State*], concerning concurrent intent, the Maryland Court of Appeals has rejected efforts to limit the application of the transferred intent doctrine. *See Harvey v. State*, 111 Md.App. 401, 681 A.2d 628, 637, *cert. denied*, 344 Md. 330, 686 A.2d 635 (1996) (concluding that "the doctrine of transferred intent operates with full force whenever the unintended victim is hit and killed" regardless of the fate of the intended victim). *See also United States v. Sampol*, 204 U.S.App. D.C. 349, 402–03, 636 F.2d 621, 674–75 (1980).[4]

729 A.2d at 326 (footnote omitted). Although appellants question the *Hunt* court's reliance on *Brooks*, which limited itself expressly to a holding of no plain error, *see* discussion, *supra*; *Brooks*, 655 A.2d at 849, it remains true that *Hunt* was unimpressed with the argument that transferred intent could not support a conviction for murder of an unintended victim

---

3. Differing in this respect from transferred intent, the theory of concurrent intent recognized in *Ruffin* holds that " '[w]here the means employed to commit the crime against a primary victim [*e.g.,* a hail of gunfire] create a zone of harm around that victim, the factfinder can reasonably infer that the defendant *intended that harm to all* who are in the anticipated zone.' " *Ruffin*, 642 A.2d at 1298 (quoting *Ford*, 625 A.2d at 1001) (emphasis added).

4. In *Sampol*, the D.C. Circuit explained that under the doctrine of transferred intent, "one who intends to kill one person and kills a bystander instead is deemed to have committed whatever form of homicide would have been committed had he killed the intended victim." 204 U.S.App. D.C. at 402, 636 F.2d at 674. The court observed that "[t]here are even stronger grounds for applying the principle where the intended victim is killed by the same act that kills the unintended victim." *Id.*

where the intended victim has also died. To that extent *Hunt* is on all fours with this case.

But the holding of *Hunt* is not entirely clear, because the court implied that other instructions given to the jury might have been tantamount to permitting conviction on the theory of concurrent intent recognized in *Ruffin*. That is—we explained—the jury was also instructed on the elements of second-degree murder and the concepts "of 'intent' and 'state of mind,'" and on the evidence presented the jury "could reasonably infer an intent to kill [the second victim] concurrent with the intent to kill [the intended one]," so that any "assum[ed]" error in giving the instruction on transferred intent "was harmless." *Id.* at 326. Given the ambiguity in *Hunt's* basis for decision, we do not take it as having decided the issue before us.

Another decision, *Moore v. United States*, 508 A.2d 924 (D.C.1986), however, likewise creates an obstacle to appellants' position because in that case the specific intent to commit a crime was realized against the intended victim, and yet we held that it could also provide the mental element for an assault against the unintended victim. Moore was convicted of the armed robbery of one Cotten, but also of assaulting Collier Rowe with the intent to rob Cotten. He argued on appeal that the statute prohibiting assault with intent to commit (*inter alia*) robbery, D.C.Code § 22–501 (1981) (recodified at § 22–401 (2001)), requires that the person assaulted be the same person whom the assailant intended to rob. This court rejected the argument, explaining first of all that "[t]he statute itself is broadly written and its legislative history does not address our question." *Id.* at 925. But, it continued,

> we are not obliged to ignore common sense and evident statutory purpose in our effort to resolve the issue.

The increased penalty attendant to an assault with intent to rob, as opposed to a simple assault, is reflective of a major statutory purpose, to punish an assailant whose criminal conduct potentially exposes the assault victim to a greater risk of harm because the assault is accompanied by an intent to commit another offense. In appellant's case, Rowe faced greater danger because he was with Cotten, the intended robbery victim. To hold that the person assaulted must be the same individual the assailant intended to rob, would disregard the many ways an assailant may effectuate his intended robbery.

*Id.* at 926 (citation omitted). And we continued: "Giving the language of [the] statute its full meaning, it would be nonsensical to limit its scope to situations involving a single victim; particularly, where the assault on one victim is used to effectuate the robbery of another at the scene." *Id.; see also Battle v. United States*, 515 A.2d 1120, 1124–25 (D.C.1986) (applying reasoning of *Moore* to sustain convictions for both kidnapping of the intended victim and assault with intent to kidnap another victim; requiring that "the assault and its aggravating intent to commit another crime ... be directed to the same person would frustrate the [statutory] purpose ... in instances where, as here, a defendant assaults one victim with the intent to effectuate the commission of another crime against a second victim").

*Moore* and *Battle*, of course, did not deal expressly with the issue of transferred intent; each concerned an issue of statutory construction. But in each, applying "common sense" and the evident legislative purpose "to punish an assailant whose criminal conduct potentially exposes the assault victim to a greater risk of harm," *Moore*, 508 A.2d at 926, because of the presence of an "aggravating intent," *Battle*, 515 A.2d at 1125, we held that the same specific

intent could provide the *mens rea* for convictions of assaulting both the intended and the unintended victim. Appellants respond correctly that in both *Moore* and *Battle* the assault on the unintended victim served to "effectuate" the intended crime—meaning at least that the assault on the unintended victim was a foreseeable result of the intended crime. But assuming this is true—that "expos[ure of] the assault victim to a greater risk of harm," *Moore, supra,* had to be foreseeable to yield the result in *Moore* and *Battle*— appellants in this case cannot dispute that when Lloyd fired at least three shots at McKinney it was foreseeable one might strike Hall, who was plainly visible standing behind or beside him. *See also In re E.D.P.,* 573 A.2d 1307, 1308 (D.C.1990) (transferred intent instruction properly given where appellant, while swinging at one individual, "was aware of the presence of … three juvenile supervisors and despite that knowledge … swung his arms and legs without caring who[m] he hit"). In the circumstances of this case, at least, appellants are hard-pressed to dispute the authority of *Moore* and *Battle* in behalf of application of transferred intent.

## C.

But even viewing appellants' proposed limitation on the doctrine as an original question, we reject it in the circumstances of this case where appellants knew or should have known that they exposed both McKinney and Hall to the shooting death they suffered.[5] Much like the assault statute construed in *Battle, see* D.C.Code § 22-403 (2001) ("Whoever assaults *another* with intent to commit any other offense punishable by imprisonment") (emphasis added), the text of the first-degree murder statute is consistent with application of its mental element to the simultaneous killing of both the intended and an unintended victim. D.C.Code § 22-2101 states that "[w]hoever, being of sound memory and discretion, kills *another* purposely, … of deliberate and premeditated malice …, is guilty of first degree murder" (emphasis added). The statute thus does not require the "purpose[fulness]" or intent of the killing to be directed against the person killed, and appellants do not so argue: such a reading would forbid application of transferred intent to the murder statute generally, something our decisions reject. *See, e.g., O'Connor,* 399 A.2d at 24–26. Nor does the statute textually imply that if the intent to kill is realized in the killing of the intended person, it is somehow "used" up or expended and may not embrace the killing of an additional, unintended victim or victims. Without changing its meaning, the statute's prohibition against the purposeful killing of "another" could as easily have been written to punish one who, "with intent to cause the death of another person, causes the death of such person *or* of a third person." Interpreting similar language, the Supreme Court of Connecticut has held that

> the statute on its face allows transferred intent for the crime of murder without limitation as to the number of people killed. The clear meaning of the statute leads to the result that, when a person engages in conduct with the intent to kill someone, there can be a separate count of murder for every person actually killed by the conduct.

*State v. Hinton,* 227 Conn. 301, 630 A.2d 593, 598 (1993). The court continued:

> Human beings are not fungible. Therefore, a separate injury to each constitutes a separate crime, and the law does

---

5. Strictly speaking, therefore, this case does not require us to consider application of the doctrine to a hypothetical situation in which the death of an unintended victim or victims is entirely unforeseeable.

not give the defendant a discount on the second and subsequent victims of his intentional conduct. Viewed through this prism, it is clear that, as to each person killed, the defendant had the "intent to cause the death of another person," and, acting with that intent, he "caused the death of . . . a third person. . . ."

*Id.* (citations omitted). The intent transferred, the court stated elsewhere, "is not [properly] regarded as a limited commodity that, once satisfied, is totally expended." *Id.* at 596 n. 8.

The Supreme Judicial Court of Massachusetts has likewise rejected the notion that "a defendant's intent is . . . exhausted or depleted based on the perpetration of the crime on the intended victim"; rather, it held, the intent "encompasses completely unintended victims (including victims of whom the defendant was unaware) who happen to suffer along with the intended victim." *Commonwealth v. Melton,* 436 Mass. 291, 763 N.E.2d 1092, 1098 (2002) (citation omitted). The court found this conclusion to be in keeping with the law "[i]n most other jurisdictions" that

the . . . principle of transferred intent applies to satisfy the element of intent when a defendant harms both the intended victim and one or more additional but unintended victims. *See, e.g., United States v. Sampol,* [*supra* note 4 and accompanying text]; *State v. Worlock,* 117 N.J. 596, 616–617, 569 A.2d 1314 (1990) . . .; *State v. Fennell,* 340 S.C. 266, 276, 531 S.E.2d 512 (2000) (where defendant shot and killed intended victim but one bullet struck and seriously injured an unintended victim, doctrine of transferred intent supported convictions of both murder of intended victim and assault and battery with intent to kill unintended victim); *Ochoa v. State,* 115 Nev. 194, 981 P.2d 1201, 1205 (Nev.1999) (same); *State v. Gillette,* 102 N.M. 695, 705, 699 P.2d 626 (N.M.Ct.

App.1985) (defendant, who delivered poisoned drink to one intended victim, guilty of three counts of attempted murder when intended victim and two others consumed it); *State v. Henley,* 141 Ariz. 465, 467, 687 P.2d 1220 (1984) (transferred intent doctrine would support two counts of aggravated assault where single shot intended for one victim struck two persons); *Mordica v. State,* 618 So.2d 301, 303 (Fla.Dist.Ct.App.1993) (where defendant kicked fellow inmate and inadvertently kicked officer who was attempting to break up fight, defendant's convictions of two batteries upheld); *State v. Livingston,* 420 N.W.2d 223, 229 (Minn.Ct.App.1988) (where defendant commanded his dog to bite intended victim and dog attacked two other persons as well, transferred intent applicable to support three counts of assault). *See also State v. Wilson,* 125 Wash.2d 212, 217–218, 883 P.2d 320 (1994) (where defendant shot at and missed both intended victims but struck and injured two unintended victims, he committed four assaults because he met statutory requirement that he act "with intent to inflict great bodily harm" and statute did not require that "the specific intent match a specific victim").

*Id.* at 1097–98 (footnote omitted). *See also Poe v. State,* 341 Md. 523, 671 A.2d 501, 503 (1996) ("[T]he passing of the bullet through the arm of the intended victim before killing the unintended victim does not alter or negate the application of the doctrine of transferred intent"); *Harvey v. State,* 111 Md.App. 401, 681 A.2d 628, 638 (1996) ("[T]here is no doubt that the guilt of the defendant for the death of the unintended victim would be precisely the same in the *Poe* scenario, regardless of whether the intended victim (1) was hit and only wounded or (2) was hit and killed. The *actus reus* perpetrated on the unintended victim would have been precisely the same. The *mens rea* or malevolent state of mind

of Poe, not subject to being 'used up' or exhausted, would then have established the kind and level of blameworthiness for that unintended homicide.").

■ Instructed by this body of law (as well as our own decisions in *Hunt, Moore*, and *Battle* ), we now hold expressly that in a murder case such as the present one, application of the transferred intent doctrine is not limited to situations in which the intended victim survives the deadly assault. To accept that limitation, given the difficulties inherent in proving criminal *mens rea* in regard to an unintended victim, *see Harvey*, 681 A.2d at 642; *Comber v. United States*, 584 A.2d 26, 39 (D.C.1990) (en banc), would risk rewarding a shooter who merely happens to have demonstrated a good aim, contrary to an underlying principle of the doctrine that "the intent with which a criminal act is done determines the legal character of its consequences." *Worlock*, 569 A.2d at 1325 (citation and quotation marks omitted). Instead, we agree with the courts cited and quoted above that "[w]hen a defendant contemplates or designs the death of another, the purpose of deterrence is better served by holding that defendant responsible for the knowing or purposeful murder of the unintended as well as the intended victim." *Id.*

### III.

■ Thurston argues separately that the evidence failed to establish his liability as Lloyd's accomplice in the murders of McKinney and Hall.[6] D.C.Code § 22–105 (1981) (recodified at § 22–2805 (2001)) permits the conviction as an accomplice of "all persons advising, inciting, or conniving at the offense, or aiding or abetting the prin-

cipal offender." Here, proof of aiding and abetting required that Thurston have "knowingly participated in the shootings by assisting [Lloyd] or participating in the commission of the crimes with guilty knowledge." *Leonard v. United States*, 602 A.2d 1112, 1114 (D.C.1992) (citation omitted).

The evidence fairly allowed the jury to find beyond a reasonable doubt either that Thurston "advis[ed and] incit[ed]" Lloyd to shoot McKinney or, at the least, that he knowingly participated in the shooting. There was evidence that McKinney and Thurston "had words," that Thurston then conferred with Lloyd and warned bystanders to leave because "something was about to happen," and that Lloyd, accompanied by Thurston, then pursued McKinney and shot him. Thurston's own statement to the police allowed the jury to infer that he had enlisted Lloyd to help remedy a perceived affront by McKinney, prompting Lloyd to leave the area momentarily and return with the murder weapon and dark clothing. The evidence associating Thurston actively with the shooting was more than sufficient.

### IV.

Both appellants contend that the trial judge erred in instructing the jury on "flight." The judge told the jury in substance that if it "f[ou]nd evidence of flight or concealment" by either defendant, it should "consider and weigh such evidence along with all the other evidence ... and give it the weight you think it deserves." The jury thus could consider flight or concealment "as evidence tending to show feelings of guilt" and hence "actual guilt," but was "not required to do so." *See*

---

6. Thurston makes no argument that the theory of transferred intent should not apply, or should apply differently, to persons charged as accomplices, and we have no occasion to consider that issue. *But cf. Lee v. United*

*States*, 699 A.2d 373, 385 (D.C.1997) ("[n]o distinction [is] made between the principals and aiders and abettors for purposes of felony murder liability" (quoting *Waller v. United States*, 389 A.2d 801, 807 (D.C.1978))).

CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.44 (4th ed.1993).

■ Supporting an inference of concealment (and to a lesser extent flight) was the evidence that Lloyd put on a dark tee-shirt and hat over his clothes just before the shootings, then removed them as he quickly walked away toward his car and left the scene (returning later without the tell-tale clothes). The instruction permitting, but not requiring, the jury to consider this as evidence of consciousness of guilt on his part was therefore not an abuse of discretion. *See Wilson v. United States*, 528 A.2d 876, 878 n. 3 (D.C.1987). Although the evidence of flight or concealment by Thurston was thinner,[7] any arguable error in including him within the reach of the instruction was not prejudicial enough to require reversal. *See Johnson v. United States*, 398 A.2d 354, 366 (D.C.1979) (inquiry into whether discretion was abused includes question whether any error was "of a magnitude [so as] to require reversal").[8]

*Affirmed.*

RUIZ, Associate Judge, concurring:

I agree that the evidence of appellants' intent to kill one person (whether as a principal or as an aider and abettor) sufficed to support their conviction for the first-degree murder of another, unintended victim, based on the majority's narrow holding that the happenstance that the intended victim is killed as well as the unintended victim does not negate that appellants had the requisite intent on the facts of this case. I write separately to clarify what we do not hold. "Intended" in this context refers to the "target" of the person with a demonstrable intent to kill. "Unintended" is someone other than the target. One who is not targeted, however, is not the same as someone who is not a foreseeable victim of the killer's actions. As the majority notes, in this case the unintended victim was standing next to the intended target, and therefore, from the shooter's point of view, was foreseeably in the line of fire. Moreover, at least three shots were fired from a distance of only seven to nine feet. The cases cited by the majority from other jurisdictions applying transferred intent to the killing of a person in addition to the target similarly involve situations in which the unintended victim was foreseeably at risk.[1]

---

7. There was evidence that Thurston left the scene with Lloyd after the shooting and that, as he did so, he accepted from Lloyd an object secreted from view.

8. We reject Lloyd's argument that his case should have been severed from Lloyd's because of inconsistent defenses. There was manifestly "enough independent evidence of [Lloyd's] guilt—beyond that required for the government to survive a motion for judgment of acquittal—" to permit the trial court's conclusion "that the conflict in defenses alone would not sway the jury to find [Lloyd] guilty." *Tillman v. United States*, 519 A.2d 166, 170 (D.C.1986). As to Thurston's remaining claim of error, the trial judge did not abuse her discretion in preventing Thurston from eliciting his out-of-court statement to a police officer—before waiving his *Miranda* rights—that he could not read. The state-

ment as offered was hearsay, *see Ford v. United States*, 487 A.2d 580, 588 (D.C.1984), and to the extent Thurston now argues that it was being offered for a purpose other than the truth of the matter asserted, we fail to see its relevance.

1. In the *Hinton* case, for example, the defendant "took a sawed-off shotgun . . . [and] fired [it] once into the group of males." *State v. Hinton*, 227 Conn. 301, 630 A.2d 593, 596 (1993). The ammunition in the gun was " 'triple ought' buckshot, the largest commercially manufactured shot. A shell loaded with triple ought buckshot typically contains eight individual pellets." *Id.* In *Poe*, the defendant used a "12–gauge shotgun" to shoot a single "50–caliber lead slug" into the door of a house in which there were 2 adults and 8 children. *Poe v. State*, 341 Md. 523, 671 A.2d 501, 502 (1996). In *Harvey*, a total of nine

This is an important qualification, for, as the majority notes, "the intent with which a criminal act is done determines the legal character of its consequences." See *ante* at 1251. (quoting *Worlock*, 569 A.2d at 1325). There is proportionality between two convictions for first-degree murder and a shooting which foreseeably placed two persons at risk of death. In such a situation, that the shooter had targeted only one person does not lend moral weight to the question whether the shooter should be held criminally responsible for the intentional killing of another who was not so targeted, yet foreseeably imperiled by the shooting. This is the essential underpinning for the theory of concurrent intent, *see Ruffin v. United States*, 642 A.2d 1288, 1298 (D.C.1994) (citing *Ford v. State*, 330 Md. 682, 625 A.2d 984, 1001 (1993)) (applying concurrent intent theory to assault with intent to kill while armed where shooter "unloosed a hail of bullets" at the targeted victim and two others who were in the "direct line of fire"), which we have deemed applicable to first-degree murder, *see Hunt v. United States*, 729 A.2d 322, 325 (D.C.1999) (per curiam).[2]

To require evidence of foreseeability in this case is consistent with judicial interpretations of the District's first-degree murder statute, which expressly permits conviction, without separate proof of specific intent to kill, on the theory of felony-murder when a killing results during the commission of certain violent offenses. *See* D.C.Code § 22–2101 (2001) (arson, first-degree sexual abuse, first-degree child sexual abuse, first-degree cruelty to children, mayhem, robbery, kidnaping, housebreaking while armed with or using a dangerous weapon, or felony involving a controlled substance). In felony-murder, the legislature has provided that the requisite intent to kill for first-degree murder is derived from the intent to commit the underlying violent felony, "a mechanism by which the jury can infer the state of mind required for first-degree murder." *Head v. United States*, 451 A.2d 615, 625 (D.C. 1982). Such killings "might otherwise be any level of homicide, including involuntary manslaughter, or even possibly a non-criminal killing." *United States v. Greene*, 160 U.S.App. D.C. 21, 44 n. 45, 489 F.2d 1145, 1168 n. 45 (1974) (citing *Coleman v. United States*, 111 U.S.App. D.C. 210, 214–16 & 220–21, 295 F.2d 555, 559–61 & 565–66 (1961)) (underlying felony provides elements of malice, premeditation and deliberation for first-degree murder). Felony-murder's "implied malice obviates the need

---

shots were fired, but missed the intended victim, while wounding another "standing in close proximity" during a fight between two rival groups of young men. *Harvey v. State*, 111 Md.App. 401, 681 A.2d 628, 630 (Md. 1996). Similarly, in *Melton* the court emphasized that "[t]he conduct here (a shot into a car full of people, fired at point blank range from a passing vehicle traveling at high speed) placed four people in equally grave peril." *Commonwealth v. Melton*, 436 Mass. 291, 763 N.E.2d 1092, 1099 (2002). In *Ochoa*, the defendant fired "several shots" at the intended victim (who was killed), and also wounded an unintended victim, with whom the intended victim had just concluded a drug transaction. *Ochoa v. State*, 115 Nev. 194, 981 P.2d 1201, 1203 (1999). In *Fennell*, the defendant "emptied his gun" at the intended victim who was standing in a buffet line at a restaurant, striking him with 5 shots, and a "stray bullet" killed a person who was "standing nearby." *State v. Fennell*, 340 S.C. 266, 531 S.E.2d 512, 514 (S.C.2000). In *Worlock*, the defendant "fired twelve rounds" from "within fifteen feet" as two people exited a taxi, one the intended target, and another standing close by. *State v. Worlock*, 117 N.J. 596, 569 A.2d 1314, 1316 (1990).

2. As the majority notes, in this case there was no objection to the instruction on transferred intent and we decide the case as it is presented to us, as a challenge to the sufficiency of the evidence. In light of our case law, it would appear that the more apt instruction would have been on concurrent intent.

for the government to prove that death was 'foreseeable' when the homicide occurs during any of [the] specified felonies." *United States v. Branic*, 162 U.S.App. D.C. 10, 13, 495 F.2d 1066, 1069 (1974). As the case before us does not involve one of the felonies specified in the statute, the government must prove intent to kill. Our decision today is simply that the intent to kill one person may support conviction for the intentional murder of another who was foreseeably at risk of death even in cases where the targeted victim also was killed. As such, it is in line with prior judicial interpretations of the first-degree murder statute and the fundamental notion of proportionality between the degree of criminal intent and criminal responsibility.