*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-1319

KELBY R. GORDON, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-5776-16)

(Hon. Milton C. Lee, Trial Judge)

(Argued November 17, 2021                    Decided November 17, 2022)

*Mindy Daniels*, for appellant.

*David B. Goodhand*, Assistant United States Attorney, with whom *Michael R. Sherwin*, Acting United States Attorney, *Elizabeth Trosman, Chrisellen R. Kolb, Lindsey Merikas,* and *Monica Trigoso,* Assistant United States Attorneys, were on the brief, for appellee.

*Samia Fam*, with whom *Shilpa S. Satoskar* and *Stefanie Schneider,* filed a brief on behalf of the Public Defender Service, as *amicus curiae* in support of appellant.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and MCLEESE and DEAHL, *Associate Judges*.

Opinion for the court by *Chief Judge* BLACKBURNE-RIGSBY.

Opinion by *Associate Judge* MCLEESE, concurring in part and dissenting in part, at page 51.

BLACKBURNE-RIGSBY, *Chief Judge*: Appellant Kelby Gordon was convicted of two counts of second-degree murder, one count of assault with intent to kill while armed ("AWIKA"), and three counts of possession of a firearm during a crime of violence ("PFCV").[1]  On appeal, he argues that there was insufficient evidence to sustain his conviction for AWIKA because the AWIKA "victim" was an unintended bystander and he therefore did not act with any intent toward her, let alone intent to kill.  Furthermore, appellant argues that the trial court erred by allowing the jury to find him guilty of AWIKA with respect to the unintended, uninjured bystander based on the common law doctrine of transferred intent.  In *O'Connor v. United States*, 399 A.2d 21 (D.C. 1979), this court explained that transferred intent "provides that when a defendant purposely attempts to kill one person but by mistake or accident kills another, the felonious intent of the defendant will be transferred from the intended victim to the actual, unintended victim." *Id*. at 24.  However, the issue of whether the doctrine of transferred intent can supply the necessary mens rea to support a conviction of AWIKA as to an unintended bystander who is not injured is a matter of first impression.  For the reasons that follow, we hold that transferred

---

[1] D.C. Code § 22-2103; §§ 22-401, -4502; § 22-4504(b).

intent does not apply in this case and we therefore vacate appellant's AWIKA conviction.

Appellant also argues that he is entitled to a new trial based on four evidentiary issues and two issues related to jury instructions. Finally, he argues that he is entitled to resentencing and an amended judgment. We reject appellant's argument that he is entitled to a new trial, but we agree that he is entitled to resentencing and an amended judgment, and therefore remand for the trial court to address these issues.

## I.      Factual and Procedural History

On March 24, 2016, around 11:15 am, Gabriel Turner left his mother's apartment located in the Parkchester Apartments complex in the Southeast quadrant of D.C., and walked toward a nearby bus stop on Martin Luther King, Jr. Avenue. The events that followed were captured by a surveillance camera monitoring the apartment complex, which first shows Mr. Turner walking on a sidewalk toward his bus stop. A few seconds later, two other men enter the frame: a Black man with long dreadlocks ("the shooter") chasing a third man ("John Doe") down the same sidewalk. As John Doe passes by Mr. Turner, the shooter points his weapon in the direction of the two men in front of him. At that moment, John Doe turns his head

toward the shooter, but keeps running and exits the frame. At about the same time, Mr. Turner collapses onto the ground, and the shooter retreats and runs in the opposite direction.

Additional surveillance cameras monitoring the apartment complex captured the shooter's next movements. From other angles, he is seen crossing the street and descending down a stairway and into the front door of 2716 Wade Road, SE.

At the time of the shooting, Carol Morris was home at her second-floor apartment on Martin Luther King Avenue, which was approximately 100-150 yards from the shooting scene. She was lying in bed when she heard several gunshots, including one that shattered her living room window and another that shattered her bedroom window. She ran to the window to look and saw a person lying still on the sidewalk below her building.

Detective Thomas O'Donnell arrived on the scene after Mr. Turner had been transported to the hospital, where he later died from his injuries. He attempted to speak to community members and reviewed footage from nearby surveillance cameras. A crime-scene officer also recovered a bullet that had pierced the bedroom window of Ms. Morris's apartment. One bullet had gone through Ms. Morris's

bedroom and pierced a wall; the other went through her living room and pierced a mirror hanging on the door of a utility closet, lodging itself about half an inch into the wall, near a water heater.

Detective O'Donnell soon learned that Detective Lavinia Quigley was conducting undercover operations in the area, so he contacted her and told that her he was looking for a "black male, long dreads, black jacket." Detective Quigley told Detective O'Donnell that his description sounded like a man she knew by the name of "Mill or Millie." The next day, Detective O'Donnell showed Detective Quigley the surveillance video, and she identified the shooter as "Millie."

Detective O'Donnell also learned that a person named Nadia Malloy lived in the apartment at 2716 Wade Road, SE, which the shooter entered after the attack. A few weeks later, Detective O'Donnell interviewed Ms. Malloy. During the interview, she said that appellant was her former boyfriend, and that he was involved in the shooting. According to Ms. Malloy, appellant told her that he shot and killed an innocent person and ran into her house afterward. Malloy also identified him in a photograph and said he went by the nickname "Mill." Police arrested appellant shortly after this interview. A grand jury subsequently indicted appellant for first-degree murder and felony murder, in violation of D.C. Code §§ 22-2101, -4502;

assault with intent to kill while armed, in violation of D.C. Code §§ 22-401, -4502; attempted robbery while armed, in violation of D.C. Code §§ 22-1803, -2801, -4502; and possession of a firearm during a crime of violence, in violation of D.C. Code § 22-4504(b).

At trial, the government presented evidence that appellant confessed to two individuals: Nadia Malloy, his former girlfriend, and Allen Culver, whom he spoke to in the D.C. jail while awaiting trial. The government's evidence also consisted of: the surveillance footage; Detective Quigley's identification of appellant; cell-tower tracking analysis that placed appellant's cell phone in the area of the shooting at the time it took place; evidence that there were six casings from a .40 caliber gun found on the scene; testimony that appellant carried a Glock-like gun; and testimony from a firearms expert that the six cartridge casings found on the scene were likely fired from the same type of Glock semiautomatic pistol.

During the defense case, appellant called Detective O'Donnell to testify. Detective O'Donnell testified that, from the surveillance footage, it appeared that John Doe also had a handgun at the time of the shooting, suggesting that John Doe could have been the shooter that killed Mr. Turner.

Following the trial, a jury convicted appellant of two counts of the lesser-included offense of second-degree murder, AWIKA, and three counts of PFCV. This appeal followed.

## II.    Discussion

Appellant argues on appeal that there was insufficient evidence presented at trial to sustain his conviction of AWIKA.  He also contends that there were several errors at trial, which — individually or cumulatively — deprived him of his right to a fair trial.  Specifically, appellant argues that the trial court: (1) admitted prejudicial "other crimes" evidence; (2) allowed a police witness to make the ultimate determination of guilt, thereby invading the province of the jury; (3) erroneously admitted evidence of appellant's threats to a witness; (4) erroneously admitted toolmark evidence; and (5) read prejudicial jury instructions. Additionally, appellant contends that he is entitled to an amended judgment based on merger, and resentencing due to a conflict between the written judgment and the oral judgment imposed by the court.  We consider each issue in turn.

## A.   Applicability of the Transferred Intent Doctrine

At trial, appellant made a motion for judgment of acquittal ("MJOA"), arguing that the government failed to prove the elements of AWIKA.  In response, the government argued that there was evidence that appellant intended to shoot John Doe, and, under a theory of "transferred intent or concurrent intent, then that intention transfers to the decedent for the homicide but also to Carol Morris for the assault with intent to kill while armed."

The trial court denied the motion, finding that there was evidence that appellant had intent to rob John Doe; the surveillance footage supports an inference of intent to kill John Doe; and appellant fired multiple shots, two of which ended up in Ms. Morris's house.  Based on that evidence, the trial court reasoned that "the evidence supports that [appellant] was not just trying to kill the John Doe and fired in a manner that had rounds entering Ms. Morris's apartment, but they also shot Mr. Gabriel Turner in the back . . . ."[2]  Over defense counsel's objection, the court

---

[2] After the close of all evidence, defense counsel renewed the MJOA, adding that "there was no indication that the shooting . . . of Ms. Morris's place was voluntarily, on purpose, and not by mistake or accident."  The motion was likewise denied by the judge because he found that there was "sufficient evidence from which a reasonable jury could conclude that the shots fired at the John Doe [were] on purpose."

instructed the jury as follows: "If the government proves beyond a reasonable doubt that Kelby Gordon fired shots actually intending to kill John Doe, but instead actually assaulted Carol Morris, an unintended victim, then by operation of law, the defendant's intent to kill is transferred from John Doe to Carol Morris."

In his brief, appellant argued that the AWIKA conviction should be reversed because he could not simultaneously be held liable for second-degree murder and AWIKA on a theory of transferred intent. In other words, appellant argued that his intent to kill could only be transferred once – either to Mr. Turner or to Ms. Morris. In response, the government noted that this court has squarely rejected the idea that transferred intent is "used up" after its application to one unintended victim. *See Lloyd v. United States*, 806 A.2d 1243, 1250 (D.C. 2002) ("[T]he principle of transferred intent applies to satisfy the element of intent when a defendant harms both the intended victim and one or more additional but unintended victims.").

In appellant's reply brief, he conceded that a defendant's intent to kill is not limited to one victim. However, he emphasized that he objected to the AWIKA conviction because Ms. Morris "was not visible to the shooter, and while she saw a bullet fly by her head, she was uninjured."

Following oral argument, we ordered the parties to file supplemental briefing. We asked the parties to address (1) whether there are cases in this jurisdiction directly addressing the issue of whether the doctrine of transferred intent can supply the necessary mens rea to support a conviction for [AWIKA] when an unintended victim is not physically injured, and (2) whether this court should adopt or reject the reasoning articulated by various state courts who have addressed this issue. We also invited the Public Defender Service of the District of Columbia to file an amicus brief addressing these issues.

Satisfied that the issue is fully briefed, we now address whether the trial court erred by concluding that the intent underlying the murder charges could be transferred to sustain an AWIKA conviction as to Ms. Morris, who was an unintended victim and was not physically injured. We conclude that the trial court so erred, and therefore vacate appellant's AWIKA conviction.

"The standard by which we review a denial of a MJOA is de novo, and we, like the trial court, determine whether the evidence, viewed in the light most favorable to the government, was such that a reasonable juror could find guilt beyond a reasonable doubt." *Tann v. United States*, 127 A.3d 400, 424 (D.C. 2015) (internal quotations and citations omitted). When reviewing the sufficiency of the evidence,

we "giv[e] full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and mak[e] no distinction between direct and circumstantial evidence." *West v. United States*, 866 A.2d 74, 80 (D.C. 2005) (citing *Busey v. United States,* 747 A.2d 1153, 1160 (D.C. 2000)).

To obtain a conviction for AWIKA, the government must prove beyond a reasonable doubt that the defendant (1) assaulted the victim,[3] (2) with the specific intent to kill, (3) while armed. *Washington v. United States*, 111 A.3d 16, 23 (D.C. 2015). The issue we must resolve is whether the government presented sufficient evidence from which a reasonable jury could conclude that appellant demonstrated specific intent to kill with respect to the alleged assault on Ms. Morris.

Neither party argues that appellant actually intended to harm Ms. Morris, let alone kill her. Instead, the government argues that the common law doctrine of transferred intent applies to this case, and as a result, evidence demonstrating

---

[3] We have endorsed varying formulations of assault. In *Ruffin v. United State*s, 642 A.2d 1288, 1295 (D.C. 1994), we stated that the elements were: "(1) an act on the part of the accused (which need not result in injury); (2) the apparent present ability to injure the victim at the time the act is committed; and (3) the intent to perform the act which constitutes the assault at the time the act is committed." The parties do not dispute that Ms. Morris was assaulted, so we take for granted that she was.

appellant's intent to kill "John Doe" transfers to the assault on Ms. Morris. Appellant contends that transferred intent is inapplicable here, where the unintended victim was neither killed nor physically injured, but merely put in fear.

**1.     This court's case law on transferred intent**

This court has squarely held that the doctrine of transferred intent applies to first-degree murder. *O'Connor*, 399 A.2d at 25. In *O'Connor*, this court explained that transferred intent "derives from common law murder," and "provides that when a defendant purposely attempts to kill one person but by mistake or accident kills another, the felonious intent of the defendant will be transferred from the intended victim to the actual, unintended victim." *Id*. at 24. However, we have not had many subsequent opportunities to define the scope or limits of the transferred intent doctrine, mainly because many cases discussing transferred intent have arisen in a plain error posture. *See, e.g.*, *Ruffin v. United States*, 642 A.2d 1288 (D.C. 1994); *Brooks v. United States*, 655 A.2d 844 (D.C. 1995); *Howard v. United States*, 656 A.2d 1106 (D.C. 1995); *Dockery v. United States*, 853 A.2d 687 (D.C. 2004); *West v. United States*, 866 A.2d 74 (D.C. 2005).

The parties disagree about whether this court has resolved the question presented here. The government argues that this court has "repeatedly affirmed" that the transferred intent doctrine may supply the necessary intent to kill to sustain an AWIKA conviction, even if the unintended victim is not physically injured. By contrast, appellant and amicus note that many transferred intent cases have arisen on a plain error posture, so the question whether transferred intent applies to AWIKA remains open. The disagreement appears to stem from this court's decision in *Moore v. United States*, 508 A.2d 924 (D.C. 1986). In that case, appellant was convicted of assault with intent to commit robbery, D.C. Code § 22-401 (formerly codified at § 22-501), after he and his accomplice approached two men at gunpoint and shot at one of the men in order to rob the other. *Id*. at 925. On appeal, this court considered whether a defendant could be convicted of assault with intent to commit robbery even though the assault victim was not the intended robbery victim. *Id*. *Moore* held that that statutory prohibition of assault with intent to commit robbery was not limited to a single victim, "particularly, where the assault on one victim is used to effectuate the robbery of another at the scene." *Id*. at 926. In reaching this conclusion, this court noted that the language of the statute, which provides that "[e]very person convicted of any assault with intent to . . . commit robbery, . . . shall be sentenced to imprisonment for not less than 2 years or more than 15 years," did

not address the question. *Id*. at 925 (citing D.C. Code § 22-501 (1981)). Drawing

instead on "common sense and evident statutory purpose," this court reasoned that

> [t]he increased penalty attendant to an assault with intent
> to rob, as opposed to a simple assault, is reflective of a
> major statutory purpose, to punish an assailant whose
> criminal conduct potentially exposes the assault victim to
> a greater risk of harm because the assault is accompanied
> by an intent to commit another offense. In appellant's
> case, [the assault victim] faced greater danger because he
> was with . . . the intended robbery victim. To hold that the
> person assaulted must be the same individual the assailant
> intended to rob, would disregard the many ways an
> assailant may effectuate his intended robbery.

*Id*. at 926.


A few months after *Moore* was decided, this court considered a similar

question in *Battle v. United States*, 515 A.2d 1120, 1124 (D.C. 1986). In *Battle*,

appellants were convicted of assaulting one person with intent to kidnap another in

violation of D.C. Code § 22-403 (formerly codified at § 22-503).[4] *Id*. On appeal,

appellants argued that that "the intent to commit the 'other offense' (i.e., kidnapping)

[must be] directed to the person assaulted." *Id*. This court relied on the rationale

from *Moore* and rejected appellant's argument because it "would frustrate the

purpose of § 22-[4]03 in instances where, as here, a defendant assaults one victim

---

[4] D.C. Code § 22-403 provides that "[w]hoever assaults another with intent to commit any other offense which may be punished by imprisonment in the penitentiary shall be imprisoned not more than 5 years."

with the intent to effectuate the commission of another crime against a second victim." *Id*. at 1125.

After *Moore* and *Battle* came *Brooks v. United States*, 655 A.2d 844 (D.C. 1995). In *Brooks*, appellant was convicted of three counts of assault with intent to murder while armed based on evidence that he fired five or six shots at an intended victim who was standing with two other people. *Id*. at 845. One of the bystanders was also struck in the legs, while the third was not hit, but was put in fear. *Id*. On appeal, appellant argued that the trial court erred by "permitting the jury to 'transfer' his specific intent to murder [the intended victim] to the act of assaulting the two unintended victims[.]" *Id*. at 846. This court reviewed only for plain error because appellant did not object to the transferred intent instruction below. *Id*. at 847. On plain error review, the majority opinion held that, while neither *Moore* nor *Battle* mentioned the doctrine of transferred intent,

> a Superior Court judge aware of *Moore* and *Battle*, asked to instruct on transferred intent as in appellant's case, would not find it easy to say how that theory differs from the very definition of § 22-[4]03's *mens rea*, which essentially makes the identity of the person intended to be assaulted immaterial.

*Id*. at 848-49. In a concurring opinion, two judges emphasized that the holding of *Brooks* was limited to a finding of no plain error, and did "not foreclos[e] an argument against transferred intent in non-fatal assault cases[.]" *Id*. at 849 (Ferren,

J., concurring). Judge Mack also wrote separately to emphasize that "the factual pattern in [*Moore* and *Battle*] reflected assaults on one victim with the intent to 'effectuate' the commission of another crime against a second victim." *Id.* (Mack, J., concurring).[5] In other words, intent was not transferred from one victim to another. Neither *Moore* nor *Battle* involved an unintended victim because in both

---

[5] Despite the concurrences' caution, one subsequent decision by this court suggested that *Brooks* stood for the broader proposition that an individual who is not a target of a shooting and is not actually shot is the victim of AWIKA. *See Dockery v. United States*, 853 A.2d 687, 699 n.11 (D.C. 2004). In a two-sentence footnote in *Dockery*, we noted that appellant also questioned "whether an individual who is not a target of the shooting and is not actually shot is the victim of an [AWIKA]." *Id.* Highlighting that appellant failed to preserve this issue, we then stated, with no analysis, that we have "answered that question affirmatively." *Id.* Thus, this court merely concluded that there was no plain error by the trial court.

The dissent concludes that *Dockery* controls here because we are bound even by mistaken analysis in past precedents. But *Dockery* does not contain any holding on this issue. *Dockery*'s only commentary on the issue, beyond stating that it was not preserved, was to attribute a holding to past cases. Misstating the holding of prior cases, with no attendant explanation or analysis, is not a holding, as "the judicial mind was not focused on the issue we now confront." *Mills v. District of Columbia*, 259 A.3d 750, 758 (D.C. 2021) (internal quotations and citations omitted). As we explained in *Brooks*, 655 A.2d at 849, the court can make "observations only to demonstrate that the asserted error in instructing on transferred intent could not have been 'obvious or readily apparent' to the trial judge," which is quite apart from issuing a binding ruling on the issue.

of those cases, the defendant intended to assault one victim so that he could commit another crime.[6]

Based on the foregoing, our cases indicate that when there is evidence that a defendant committed an assault to effectuate another felony, the identity of the assault victim need not be the same as the victim of the other felony to sustain a conviction such as AWIKA. However, when evidence shows that a defendant committed an assault to effectuate another felony, there is no need to "transfer" the defendant's intent because there are no "unintended victim[s]" who were physically

---

[6] In *McCrae v. United States*, 980 A.2d 1082 (D.C. 2009), appellant challenged the sufficiency of evidence to convict him for AWIKA with respect to a plainclothes police officer who arrived on the scene during a shooting between two rival gangs. *Id.* at 1090. This court affirmed and cited *O'Connor*, 399 A.2d at 25, without analysis, for the proposition that "that the doctrine of transferred intent is part of the law in the District of Columbia." *Id.* at n.11. However, *O'Connor* held only that the doctrine of transferred intent is part of this jurisdiction's law with respect to consummated homicide and did not consider its application in the context of a non-fatal assault. Regardless, "the evidence showed McCrae was one of the six gunmen who went to Holmead Place *with the intent to shoot anyone they saw there*." *Id.* (emphasis added).

Similarly, in *Matter of E.D.P.*, 573 A.2d 1307 (D.C. 1990), appellant hit and kicked three supervisors while attempting to fight with another detainee. This court highlighted that "appellant was aware of the presence of the three juvenile supervisors and despite that knowledge he swung his arms and legs without caring who he hit." *Id.* at 1308. Thus, the trial court had correctly concluded that intent could transfer because "in hitting the three juvenile supervisors[,] [appellant's act] was not accidental or incidental, but rather a deliberate attempt to remove any impediment to his ability to make contact with [another detainee]." *Id.*

harmed by "mistake or accident." *See O'Connor*, 399 A.2d at 24. Thus, contrary to the government's assertion, the cases stemming from *Moore* do not decide the present issue, and, contrary to the dissent's position, we have not identified any other binding precedent from this jurisdiction that is on point.

We therefore conclude that this court has never had the opportunity to squarely address the narrow issue presented in this case – whether the doctrine of transferred intent can supply the necessary mens rea to support a conviction for AWIKA when an unintended victim is not physically injured. In other words, we must determine as a matter of first impression if, "when a defendant purposely attempts to kill one person but by mistake or accident [puts an unintended bystander in fear], the felonious intent of the defendant will be transferred from the intended victim" to the unintended bystander. *See O'Connor*, 399 A.2d at 24.

**2. Other authority on transferred intent**

Having identified no binding precedent exactly on point on this issue in our jurisdiction, we take guidance from other courts. In *Harvey v. State*, 681 A.2d 628 (Md. Ct. App. 1996), the Maryland Court of Special Appeals reversed appellant's conviction for assault with intent to murder after concluding that the trial court erred

in instructing the jury on transferred intent because the victim was an unintended bystander who was hit but not killed. *Id*. at 644. In reaching this conclusion, the court conducted a comprehensive analysis of transferred intent and its application in various scenarios, including "where the unintended target may have been 1) hit and killed, 2) hit but only wounded, or 3) endangered but missed." *Id*. at 634.

First, the Maryland court explained that "[t]he classic transferred intent scenario was that in which lethal force was directed toward an intended victim, missed its target, and killed an unintended victim. That was the context in which the doctrine was hammered out as part of English common law." *Id*. The court went on to explain that the concept of transferred intent derived from a "necessity principle" specific to homicide cases:

> In cases involving the actual consummated homicide of an unintended victim, the necessity is that the homicidal agent can only be convicted of the homicide if the law can attribute to him one of the murderous *mentes reae*. It is frequently impossible to do that without resort to the transferred intent doctrine.

*Id* at 642. Indeed, the severe punishment attendant to premeditated or deliberate murder is a reflection of society's desire to condemn those who set out to take another's life and succeed in doing so. Thus, when a defendant intends to kill one victim, and due to bad aim, kills another, his "culpability under the law and the resultant harm to society is the same as if he had accomplished the result he intended

when he caused the death" of the bystander. *Gladden v. State*, 330 A.2d 176, 188 (Md. 1974). "The punishment is imposed in accordance with the culpability of the accused under the law and justice is served by punishing him for a crime of the same seriousness as the one he undertook to commit." *Id*. "The obvious purpose behind this doctrine is to prevent a defendant from escaping liability for a murder in which every element has been committed, but there is an unintended victim." *Poe v. State*, 671 A.2d 501, 504 (Md. 1996).

By contrast, "non-application of the transferred intent doctrine to cases of inchoate criminal homicide [including assault with intent to kill] does not create the punishment vacuum that might be present in cases of consummated criminal homicide." *Harvey*, 681 A.2d at 642-43. For example, "[t]he defendant clearly can be convicted of attempted murder as to the primary victim and some other crime, such as criminal battery, as to other victims." *Id*. at 643. Moreover, "[i]n the case of unintended victims who are simply in harm's way and are not actually injured, the crime of reckless endangerment is also available to pick up much of the slack and to make resort to the transferred intent doctrine less compelling." *Id*. at 643. The Maryland court further noted that "extend[ing] the doctrine of transferred intent to cases where the [un]intended victim is not harmed would be untenable" because the "absurd result would be to make one criminally culpable for each unintended

victim who, although in harm's way, was in fact not harmed by a missed attempt towards a specific person." *Id*. at 639 (quoting *Harrod v. State*, 499 A.2d 959, 968 (Md. Ct. App. 1985)).[7]

Likewise, the California Supreme Court has explained that

> In its classic form, the doctrine of transferred intent applies when the defendant intends to kill one person but mistakenly kills another. The intent to kill the intended target is deemed to transfer to the unintended victim so that the defendant is guilty of murder. Whatever its theoretical underpinnings, this result is universally accepted. But conceptual difficulties arise when applying the doctrine to other facts.

*People v. Bland*, 48 P.3d 1107, 1110 (Cal. 2002). In declining to extend transferred intent to attempted murder, *Bland* identified an important concern applicable to the question we must answer in this case:

> Assuming an attempted murder scenario where the defendant fires a shot at an intended victim and no bystanders are physically injured, one sees that it is virtually impossible to decide to whom the defendant's intent should be transferred. Is the intent to murder transferred to everyone in proximity to the path of the

---

[7] In *Harrod*, the defendant swung a hammer, intending to injure his wife's friend, but missed. 499 A.2d at 960-61. The hammer struck the wall above the crib where the defendant's son was sleeping. *Id.* at 960. Although the child was uninjured, the defendant was convicted of assaulting him. *Id.* at 960-61. The Court of Special Appeals reversed, holding that the doctrine of transferred intent does not extend "to cases where a third person is not in fact harmed." *Id.* at 963.

> bullet? Is the intent transferred to everyone frightened and thereby assaulted by the shot? There is no rational method for deciding how the defendant's intent to murder should be transferred.

*Id*. (quoting *Ford v. State*, 625 A.2d 984, 1000 (Md. 1993)).

Considering the foregoing authorities, we are persuaded that extending transferred intent to situations where an unintended victim is not physically injured departs too far from the origins of the doctrine, which developed to hold a defendant fully accountable for the most extreme form of harm. Transferred intent allows a defendant to be punished "for a crime of the same seriousness as the one he undertook to commit." *Gladden*, 330 A.2d at 188. Thus, if a defendant shoots and injures "A," his intended victim, but kills "B," an unintended victim, applying transferred intent is necessary to find the defendant guilty of murdering "B." Without transferred intent, the defendant could be found guilty of attempted murder or AWIKA of "A" and perhaps manslaughter of "B," but he would escape liability for the more serious crime of intentional murder despite his actions and criminal state of mind. By contrast, transferred intent is not necessary to hold a defendant criminally liable for AWIKA when an unintended target does not suffer any physical injury. If a defendant shoots at "A," and misses, injuring no one, he may still be convicted of AWIKA as to the intended victim without transferred intent.

Additionally, like the Maryland and California courts, we are concerned with the potentially expansive liability that would result by extending transferred intent to assaults on unintended victims who suffer no physical injury. The government appears to share this concern and asserts that this court's decision in *Lloyd* "suggests" that an unintended victim's harm must, at minimum, be foreseeable. *See Lloyd*, 806 A.2d at 1249. However, as the government acknowledges, *Lloyd* assumed, without deciding, that transferred intent would only apply to a foreseeable homicide victim, and did not consider "a hypothetical situation in which the death of an unintended victim or victims is entirely unforeseeable." *Id.* at 1249 n.5. Importantly, *Lloyd* concerned transferred intent to sustain a first-degree murder conviction; thus, the *Lloyd* court had no occasion to consider whether foreseeability would meaningfully limit liability if transferred intent were applied to unintended, uninjured victims. Indeed, we do not view foreseeability as a meaningful limitation because, unlike in the case of murder, non-injurious assaults on bystanders can theoretically occur any time a defendant acts with an intent to kill. If physical injury to a bystander were irrelevant to transferred intent, many more defendants who are charged with intent-to-kill crimes could begin to face additional charges for AWIKA against unintended bystanders who are arguably in harm's way.[8] We can imagine a

---

[8] It is for this reason that the principles of merger may not be sufficient to limit liability. A "single assaultive act[] directed at a group of individuals (injuring

scenario where defendants are routinely charged with an additional count of AWIKA any time there is evidence that a bystander was present when they acted with intent to kill, regardless of the resulting physical harm to the alleged AWIKA victim. For example, any shooting near an apartment building could lead to additional charges. Instead of ensuring "that the proper punishment can be imposed," *Ruffin*, 642 A.2d at 1295, applying transferred intent to sustain an AWIKA conviction when an unintended bystander is not physically injured would expose defendants to up to fifteen years of additional prison time, even though they caused no additional injury as a result of their actions and criminal state of mind. *See* D.C. Code § 22-401.[9]

---

none of them) . . . give[s] rise to only one count of assault." *Ruffin*, 642 A.2d at 1296 n.14. However, "[w]here multiple shots are fired at more than one person, multiple convictions are appropriate." *Id.*

[9] We note that at least two other courts have concluded that physical injury is not necessary to apply transferred intent. *See State v. Gillette*, 699 P.2d 626, 636 (N.M. Ct. App. 1985); *Commonwealth v. Melton*, 763 N.E.2d 1092, 1098-99 (Mass. 2002). However, as the Alaska Court of Appeals has noted, under such a rule, a defendant could be found guilty of attempting to kill everyone in a crowded building when a defendant fires multiple shots at the intended victim. *Ramsey v. State*, 56 P.3d 675, 681-82 (Alaska Ct. App. 2002). We recognize that, in this jurisdiction, "a single assaultive act—directed at a group of individuals, but injuring no one—bears only one count of assault." *McCoy v. United States*, 890 A.2d 204, 214 n.28 (D.C. 2006). But, as noted, when multiple shots are fired involving more than one person, "'multiple convictions are appropriate.'" *Id.* (quoting *Ruffin*, 642 A.2d at 1296). We reject the reasoning in *Gillette* and *Melton* to the extent they failed to consider this illogical result.

In light of the reasons we have articulated, we therefore hold that the doctrine of transferred intent is inapplicable to sustain a conviction of AWIKA when there is no physical injury to an unintended victim.[10]

Because we determine that transferred intent does not apply to AWIKA when an unintended victim is not injured, whether appellant was guilty of AWIKA with respect to Ms. Morris "depends on his mental state as to [her] and not on his mental state as to the intended victim." *Bland*, 48 P.3d at 1110.

To be clear, we do not suggest that Ms. Morris was not harmed by the bullets entering her home. Ms. Morris was, undisputedly, put in fear by the gunfire, including by one bullet that flew over her head. However, Ms. Morris was also entirely unseen by appellant, and she was physically uninjured. Accordingly, we must vacate appellant's AWIKA conviction because it is undisputed that the

---

[10] This does not mean that a defendant can never be convicted for AWIKA of an unintended, uninjured victim. This jurisdiction has adopted the theory of concurrent intent "[w]here the means employed to commit the crime against a primary victim [e.g., a hail of gunfire] created a zone of harm around that victim, the fact[-]finder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone." *Ruffin*, 642 A.2d at 1298 (internal quotations and citations omitted). This court has only applied concurrent intent in cases where an unintended victim is foreseeably at risk. *See, e.g.*, *West*, 866 A.2d at 80 (finding that an instruction of concurrent intent would have been appropriate "where the unintended victim's proximity, known to appellant, exposed her to harm when he began to fire at the intended victim.").

government failed to produce any evidence that appellant assaulted Ms. Morris with the specific intent to kill her or in order to effectuate another killing.

## B.     Evidence of Other Crimes

Appellant next raises several trial errors, including the court's admission of "other crimes evidence."  At trial, Detective Quigley identified appellant as the shooter.  Detective Quigley was able to identify appellant because at the time of the shooting, she was working undercover to investigate appellant for conspiracy to sell drugs.  Before trial, the government explained that Detective Quigley would not testify about appellant's drug sales, but that it would present body-worn camera videos of Detective Quigley interacting with appellant in a hallway while undercover.  The government edited these videos to eliminate any visuals or discussions about buying drugs.  According to the government, these videos "go[] to the length and nature of [Detective Quigley's] interaction with [appellant], how close they are, how long she's actually speaking to him face to face."

The trial court found that this evidence was "incredibly probative" of Detective Quigley's ability to identify appellant and, after viewing the footage, was satisfied that the jury would not see any evidence of illegal drug dealing.  As a result,

the judge allowed the government to show the videos to the jury. Detective Quigley also testified that she continued to interact with appellant over the phone and through text messages. She discussed one day when they planned to meet up, and she texted appellant, "Yeah, how much? I'm about to walk to you."[11] On appeal, appellant argues that the trial court erred in admitting Detective Quigley's testimony about working undercover, the videos, and text messages because they were evidence of "other crimes" that were more prejudicial than probative. We disagree and affirm the trial court on this issue.

A trial judge has "broad discretion to determine the substance, form, and quantum of evidence which is to be presented to a jury." *Johnson v. United States,* 452 A.2d 959, 960 (D.C. 1982). Our scope of review is limited to whether the trial court has abused its discretion. *Rodriguez v. United States*, 915 A.2d 380, 385 (D.C. 2007).

Appellant relies mainly on *Drew*, which states:

> It is a principle of long standing in our law that evidence of one crime is inadmissible to prove disposition to commit crime, from which the jury may infer that the defendant committed the crime charged. Since the

---

[11] One of the two button-camera videos presented at trial took place on the same day as the text that read, "Yeah, how much?" Detective Quigley testified that she was texting with "Millie" before meeting up with appellant, as seen in the video.

> likelihood that juries will make such an improper inference is high, courts presume prejudice and exclude evidence of other crimes unless that evidence can be admitted for some substantial, legitimate purpose.

*Drew v. United States*, 331 F.2d 85, 89-90 (D.C. Cir. 1964).  At trial, appellant objected only to the videos,[12] and takes issue with them on appeal, insisting that the videos show clear evidence of illegal drug transactions.  The government contends that the footage is not evidence of "other crimes," but is rather evidence of prior contacts with police.  Accordingly, the government notes that "[t]his court has held on several occasions that evidence of prior contacts with the police does not necessarily amount to evidence of other crimes or bad acts."  *Rodriguez*, 915 A.2d at 387 (citing *Chappelle v. United States,* 736 A.2d 212, 215 (D.C. 1999)).  Indeed, in *Rodriguez*, this court found no error in allowing police officers to testify that they knew a defendant "from the area," reasoning that these were neutral references and their probative value outweighed the risk of prejudice.  *Id*. at 384, 386-87.

---

[12] During the government's direct-examination of Detective Quigley, she was asked about her considerations and priorities while working undercover, including how she stays safe and how she stays in touch with her backup team. During this discussion, defense counsel objected to "this entire line of questioning" arguing that it "has now turned into a drug trial."  The court overruled the objection because "she didn't say anything about drugs" and "she could be investigating anything."  Before the texts were published to the jury, defense counsel was specifically asked whether he objected, and he declined.

Here, the videos reveal more than an officer's "neutral references" to their prior contacts with a defendant. The visual element allowed jurors to make inferences as to what is happening in the footage and likely invited them to speculate as to why the detective was investigating appellant undercover with a camera. However, as discussed above, the government agreed to edit the footage to eliminate visuals of drug interactions and to mute certain portions of the video in which drug transactions were discussed.

In any event, regardless of how the evidence is characterized ("other crimes," "prior contacts" or otherwise), its admissibility is determined by a balance of the probative value versus the prejudicial effect. Evidence of other crimes "may be admitted if the government shows that the importance of the evidence to proving a material fact in issue outweighs its potential for unfair prejudice." *Wilson v. United States*, 690 A.2d 468, 471 (D.C. 1997) (Ruiz, J., concurring). Similarly, evidence of prior contacts with police, even when relevant, is inadmissible if the danger of unfair prejudice substantially outweighs its probative value. *See Rodriguez*, 915 A.2d at 385-86.

We see no reason to disturb the trial court's conclusion that the probative value of the videos outweighed their prejudicial effect. As the trial court explained,

if [the video clips hurt], that's not a reason to keep it out. [It has] to be unfairly prejudicial. And I just have to say, I don't see it. The government seems to have been reasonable in trying to cut out things that might suggest illegal activity. It's just a bunch of dudes hanging out in a hallway.

…

There's no clear drug transaction on there. The government's taken out references and statements about drugs. You know it's probative. It's incredibly probative because the government's got to prove identity. And the video of the actual shooting is . . . the most significant evidence of that. And the identification of the person on there by an officer who's had direct and extended contact with Mr. Gordon seems incredibly probative. And to the extent that there is some unfair prejudice, it certainly seems not to be so substantial that it outweighs probative value.

While there may have been some risk that the jury would infer wrongdoing from the fact that the detective was undercover with a camera, or from the footage itself, we cannot conclude that risk "*substantially* outweigh[ed] [its] probative value." *Johnson v. United States*, 683 A.2d 1087, 1099 (D.C. 1996) (en banc). Accordingly, we affirm the trial court's ruling on this issue.

## C. Jury Instructions

Appellant next raises two issues related to the trial court's jury instructions. First, appellant argues that the trial court erroneously responded to the jury's request

that it elaborate on the meaning of circumstantial evidence. Second, appellant contends that the trial court coerced a verdict when it asked the jury to continue deliberating after they said they were deadlocked. We disagree as to both arguments.

### 1. Re-instruction on circumstantial evidence

Before the jury was sent to deliberate, the trial court gave instructions that included an explanation of the difference between circumstantial and direct evidence.[13] Several hours later, the jury sent the court a note asking, "[C]an you

---

[13] The court read the Red Book instructions:

> Now, there are two types of evidence from which you may determine the facts in this case. There is direct evidence and there is circumstantial evidence.

> So when a witness, such as an eyewitness, asserts actual knowledge of a fact, that witness' testimony is considered direct evidence.

> On the other hand, evidence of facts and circumstances from which reasonable inferences may be drawn is circumstantial evidence.

> So let me see if I can give you an example.

> Assume a person looked out a window and saw it snowing. And they then came to court and testified that during the course of these events you looked out the window and it

elaborate on circumstantial evidence and what it means." The trial court gave the parties an opportunity to suggest responses, and the government requested that the court provide the following additional examples of direct and circumstantial evidence:

> [I]f a child tells their parent that they ate . . . their birthday cupcake that is direct evidence. Circumstantial evidence would be if an adult observes the cupcake missing from the cupcake stand, cupcake crumbs leading to the child, frosting on the child's face.

Defense counsel objected to any more examples and requested that the court "give [the jury] what they asked for . . . an explanation of the difference between circumstantial and direct evidence." Defense counsel also asked that the court include language that, "proof of an ultimate fact may not be based upon mere

---

> was snowing. That would be direct evidence that it was snowing during the course of the incident.
>
> On the other hand, circumstantial evidence, if a witness were to come home, no snow on the ground, no snow on the cars, trees or homes adjacent to the witness'. And the witness goes in and takes a nap. And when the witness wakes up, looks out the window, and sees snow on the ground, on cars, on trees and on other homes and testified to that fact in court. You can reasonably conclude that it actually snowed during the time and that that witness was asleep. That, ladies and gentlemen, is circumstantial evidence.
>
> The law says that both direct and circumstantial evidence are acceptable means of proving a fact. And the law does not favor one form of evidence over another.

possibility, speculation or conjecture." Ultimately, the court decided that another example would help dispel the jury's confusion, reasoning that "what we gave them in the current set of instructions did not answer the question satisfactorily for them." Accordingly, the trial court crafted a response that included both an explanation and another example:

> Circumstantial evidence is based on reasonable inferences drawn from factual evidence. For example, what a witness may have seen, heard, smelled, felt or tasted, circumstantial evidence is evidence that tends to prove a fact by proving other events or circumstances which afford a basis for a reasonable inference of the occurrence of the fact at issue.

> However, when considering circumstantial evidence, you must accept only reasonable conclusions and you must reject any conclusions that are unreasonable or that are based on speculation or guesswork.

> So let me try to give you an additional example of what we mean by circumstantial versus direct evidence.

> If a parent observed their child eat a cupcake and then later came to court to testify about what they had observed, that would be direct evidence. By contrast, circumstantial evidence would be if the parent observed a cupcake missing from the cupcake stand and cupcake crumbs leading to the child's bedroom. And then saw frosting on the child's face. The parent could reasonably draw the inference that the child ate the cupcake.

> In determining whether the government has met its burden of proof, of proof beyond a reasonable doubt, you should consider all of the evidence both direct and circumstantial.

> The law does not favor one form of evidence over the other.  You are permitted, ladies and gentlemen, to give equal weight to both direct and circumstantial evidence.
>
> In the end, you should give all of the evidence, whether it be direct or circumstantial, as much weight as you believe it is fairly entitled to receive.

Appellant forcefully argues that the court's instruction was erroneous because the cupcake example was unbalanced and too closely mirrored the government's evidence.  We disagree.

The decision on what further instructions to issue to the jury lies within the sound discretion of the trial court, and we review for abuse of discretion.  *Gray v. United States,* 79 A.3d 326, 337 (D.C. 2013) (internal citations omitted).  Here, the trial court was tasked with clearing up the jury's confusion.  "In response to specific difficulties encountered by the jury, the trial court must clear them away with concrete accuracy."  *Washington v. United States*, 111 A.3d 16, 24 (D.C. 2015) (internal quotation marks and citations omitted).  In so doing, "the trial judge must be especially alert not to send the jury back to resume deliberations having most recently heard supplemental instructions which are unbalanced."  *Davis v. United States*, 510 A.2d 1051, 1053 (D.C. 1986).  Considering both parties' suggested responses alongside the court's ultimate instruction, we conclude that the court

provided a balanced response that was reasonably crafted to dispel the jurors' confusion.

Defense counsel urged the court to simply re-read the Red Book instruction. However, the trial court recognized that it had an obligation to respond as directly as possible to the jurors' confusion, and the original instruction "did not answer the question satisfactorily for them." While the trial court rejected defense counsel's suggestion, it did not fully adopt the government's proposed response either. The court edited the government's suggested example to eliminate the reference to a child "telling" their parent that they ate a cupcake in order to avoid highlighting the evidence of the confessions. Additionally, the court was responsive to defense counsel's concern that the re-instructions should not merely highlight the senses of hearing and seeing. It therefore included in its explanation that circumstantial evidence could be based on "reasonable inferences drawn from factual evidence . . . [including] what a witness may have seen, heard, smelled, felt or tasted[.]" Moreover, the trial court adopted defense counsel's suggestion to remind the jury that, when considering circumstantial evidence, they must accept only reasonable conclusions and must reject any conclusions that are based on speculation or guesswork. In sum, the trial court's re-instruction represents a compromise that reflects both parties' concerns.

Appellant also argues that the trial court's cupcake example was not neutral and too closely mirrored the government's evidence. In appellant's view, the re-instruction "was an illustration of frosting on the defendant's mouth and an inference that he had gotten caught with his hand in the proverbial cookie jar." Appellant further argues that the "cupcake crumbs" were an "obvious reference" to the government's trail of evidence because at closing arguments, the government referenced a "path of stones" leading to defendant. We find no obvious connection between the court's example and the government's evidence. The example is neutral on its face. It merely illustrates a parent observing a missing cupcake, crumbs on the floor, and frosting on the child's mouth. There is no language suggesting any wrongdoing on the child's part or anything else connecting the example to the facts of this case. Accordingly, we conclude the trial court's re-instruction on circumstantial evidence was balanced, neutral, and cleared the jury's response with concrete accuracy, and thus was not an abuse of discretion.

## 2. Coerced Verdict

Appellant also argues that the judge coerced a verdict when it asked the jury to continue deliberating after they announced they were deadlocked. We disagree.

Twenty minutes after the jury received re-instructions on circumstantial evidence, they sent the judge another note asking to see Ms. Malloy's testimony again. Once the jurors received the transcript of Ms. Malloy's testimony, they continued deliberating for two additional hours before announcing a deadlock. Appellant moved for a mistrial, but the government requested Red Book Instruction 2.601(I) (Initial Instructions to Jury That Indicates It Cannot Agree). The court followed the pattern instruction to near precision,[14] adding only the context that the jury had recently requested to review Ms. Malloy's testimony:

> So I recognize that you have indicated to us that you believe you are deadlocked at this point.
>
> This is a case that took multiple days of evidence. There are a number of exhibits, a good number of witnesses and

---

[14] The Red Book instruction reads:

Your note indicates that you have been unable to reach a unanimous decision at this time. [This has been a relatively long trial—longer than many trials we have in this courthouse. There were a large number of witnesses who testified and a substantial amount of evidence received, and I would expect that it would take some time to reach a resolution of this matter.] My best judgment is that you have been deliberating for a total of about [[insert number] [hours] [days]], which is not unusual in cases such as this. As a result, I am going to ask that you deliberate further in this case and that you keep an open mind about the case with a view to listening to others and expressing your own point of view to see whether you can reach a unanimous decision. Please resume your deliberations at this time.

exhibits. This case is longer than most cases that are tried here in the Superior Court.

In addition to that, you requested on Friday, after we responded to your first note, that you wanted to see the transcript of a particular witness; and then, in response to a separate note, you indicated that you did not believe that deliberations would be helpful without first getting that transcript.

And so we then undertook the efforts to get the transcripts and delivered them to you this morning for your deliberations.

Given the delayed start on Friday, my rough estimate— it's very rough—is that, between receiving the case on Thursday, the limited ability to deliberate on Friday and then this morning's deliberations, you've had about five hours or so to look at a case that, as I've indicated, with multiple witnesses, a good number of exhibits and that additional transcript that I gave you, I would expect that it would take some time to reach a resolution in this matter.

Given all that I've just related to you and given the period of time that you have been deliberating, I am going to ask you to deliberate further in this case, but to make sure that you keep an open mind about the case, about the evidence, with a view towards listening to others and expressing your very own point of view about the evidence to see if you can reach a unanimous verdict.

So, with that, ladies and gentlemen, I'm going to ask you to return to deliberations.

Appellant argues that the language about Ms. Malloy's testimony is coercive because it admonishes the jury for not looking more closely at the evidence. However, appellant never objected to the court's instructions at trial. Therefore, he

must demonstrate plain error. *See Guevara v. United States*, 77 A.3d 412, 418 (D.C. 2013).

A jury instruction is impermissibly coercive if it "would objectively appear to force a juror to abandon his honest conviction as a pure accommodation to the majority of jurors or the court." *Fortune v. United States*, 65 A.3d 75, 85 (D.C. 2013) (quotations omitted). "It usually is not coercive for a judge to respond initially to a deadlock note simply by asking the jury in neutral, careful terms to continue deliberating . . . Indeed, a pattern jury instruction is available for this purpose." *Id.* at 86.

The pattern jury instructions allow a court to remind the jury of the length of the trial, the number of witnesses, and the amount of evidence. The trial court's instructions here were consistent with this framework. The language about the testimony transcript merely highlighted the specific evidence the jury indicated it needed to review. Moreover, the jury had only been deliberating for five hours after a two-week trial. Considering the jury's request for the transcript along with the timeframe of the deliberations, we cannot conclude that these instructions exacerbated any "danger of coercion that exists where the jury has been deliberating without result for a considerable length of time[.]" *Fortune*, 65 A.3d at 85-86

(internal quotations omitted).  Thus, the trial court did not err – let alone plainly err – by instructing the jury as it did.


**D.      Detective O'Donnell's Testimony as to Appellant's Guilt**


Appellant next argues that Detective O'Donnell invaded the province of the jury by testifying as to the ultimate issue of guilt.  Detective O'Donnell was called as a witness by the defense.  During defense counsel's direct examination, Detective O'Donnell testified that the surveillance video showed that "John Doe" appeared to have a handgun.  On cross-examination, the government clarified that "John Doe" appeared to pull out a firearm after he ran past the decedent, so John Doe's back was to decedent when he was killed.  The government then asked, over objection, "[I]t's also correct that Kelby Gordon is the only one with a gun standing behind the decedent, right?"  The detective responded, "That's true."  Appellant argues that this was impermissible testimony about the ultimate issue of fact and guilt.

Appellant relies exclusively on *Lampkins v. United States*, 401 A.2d 966, 968-69 (D.C. 1979), for the contention that this testimony invaded the province of the jury.  However, *Lampkins* considered whether an expert's testimony "went beyond helpful background information" and whether the expert opined about an issue

which the "jury was as competent as the expert" to assess. *Id*. at 969. Therefore, *Lampkins* is inapposite.

Additionally, Detective O'Donnell did not "tell the jury what result to reach." *See Steele v. D.C. Tiger Mkt.*, 854 A.2d 175, 181 (D.C. 2004) (internal citations and quotations omitted). Before Detective O'Donnell was called by the defense, he had testified for the government. During his earlier testimony, the detective was careful to use generic terms to describe the person who shot at John Doe; he used terms such as "the person," "the shooter," "the individual," "[t]he individual that was behind Mr. Turner," and "the person fleeing toward Birney Place." During the contested portion of his testimony for the defense, the detective was explaining the location of the three individuals on the surveillance videos relative to one another. Therefore, the jury likely understood that when Detective O'Donnell agreed that "Kelby Gordon" was standing behind Mr. Turner with a gun, he was agreeing as to the individual's location behind Mr. Turner, not that the individual was Kelby Gordon.

In any event, we agree with the government that any error in admitting this testimony was not particularly prejudicial. At this point in the trial, the jury had heard all of the government's evidence, and therefore knew that the government's theory of the case rested on the two confessions, along with Detective Quigley's

identification of appellant, and cell-tower analysis putting appellant's phone close to the murder scene, and not on Detective O'Donnell's last-minute "identification." Moreover, defense counsel could have clarified on re-direct that Detective O'Donnell had no familiarity with appellant, but declined to do so. In sum, we see no error in admitting this testimony, and even if there was error, it was harmless considering the strength of the other evidence in this case.

### E. Toolmark Evidence

Next, appellant argues that the trial court erred by admitting prejudicial toolmark identification evidence. At trial, the government called Christopher Coleman to testify as a firearms expert. He discussed the markings he had observed on the six shell casings discovered at the murder scene and two bullets recovered from Mr. Turner's body and Ms. Morris's apartment. Mr. Coleman explained that, based on this "toolmark evidence," the six casings "most likely" were fired from some type of Glock semiautomatic pistol. He further testified that the two bullets were "consistent" with a Glock, but he could not exclude another type of gun, or say conclusively that they were fired from the same gun. On re-direct, Mr. Coleman testified that "all six cartridge cases were fired in the same gun." Appellant did not object to Mr. Coleman's testimony at trial. We thus review only for plain error.

*Williams v. United States*, 130 A.3d 343, 347 (D.C. 2016) (citing *Jones v. United States,* 990 A.2d 970, 980-81 (D.C. 2010)).

Appellant cites this court's holding that "it is error for an examiner to provide unqualified opinion testimony that purports to identify a specific bullet as having been fired by a specific gun via toolmark pattern matching." *Williams v. United States*, 210 A.3d 734, 742-43 (D.C. 2019). *Williams* expressly limited its holding to the precise issue of an examiner providing "unqualified testimony," and did not reach the related issue of whether an expert using toolmark analysis may link a specific bullet to a specific gun if he does not "do so with absolute or 100% certainty." *Id*. at 740-41 (quoting *Gardner v. United States*, 140 A.3d 1172, 1184 n.19 (D.C. 2016)). Appellant's reliance on *Williams* is misplaced because Mr. Coleman neither provided unqualified testimony nor matched a specific bullet *to a specific gun*. Rather, Mr. Coleman was careful to qualify his opinion, and only opined on the fact that the six cartridges were most likely fired from a similar type of *unspecified* gun. Accordingly, the trial court did not err – let alone plainly err – by failing to sua sponte strike Mr. Coleman's testimony.[15]

---

[15] *Williams v. United States*, 210 A.3d 734, 736 (D.C. 2019), was issued after the trial. However, "plainness is assessed as of the time of appellate review regardless of the state of the law at the time of trial." *Malloy v. United States*, 186 A.3d 802, 815 (D.C. 2018) (internal quotations and citations omitted).

### F.     Evidence of Appellant's Threat to Ms. Malloy

Appellant next argues that the trial court erred when it admitted evidence that appellant sent a threatening text message to Ms. Malloy.  Specifically, appellant allegedly texted her: "Bitch, you set me up."  The government contends that this evidence was admissible as consciousness of guilt and because it rebutted appellant's suggestion that Ms. Malloy was cooperating with the government in exchange for financial benefits.  We agree with the government and affirm the trial court's admission of this testimony.

At trial, Detective O'Donnell testified for the government that, after the shooting, Ms. Malloy told him that appellant was connected to the incident.  On cross-examination, defense counsel suggested that police enticed Ms. Malloy to cooperate by offering her money and other benefits.  Defense counsel asked Detective O'Donnell, "So you agree that if she would assist you, you would get her someplace to live; right?"  Detective O'Donnell explained that he told Ms. Malloy that he could "assist her in getting alternate housing" if "her helping us in this investigation was only hindered by the fact that she would be scared to live in her place[.]"  On re-direct, Detective O'Donnell further explained that Ms. Malloy had

told him that she was scared to stay in the neighborhood because of "a specific threat that [appellant] had made to her."  Defense counsel objected to testimony about this threat, but the trial court ruled that the testimony was admissible to rebut the "implicit suggestion that Ms. Malloy was looking for other benefits" and it demonstrated "that she had a reason to fear for her safety, and that was the real reason that she wanted to get moved."

Later on in the trial, Ms. Malloy testified for the government. On direct examination, she explained that she had not wanted to be a witness in a murder trial because "[they] get threats" and "[t]hey don't live long."  She then testified, "It was threatening towards me when he said that I set him up."[16]  During cross-examination, defense counsel again suggested that Ms. Malloy was cooperating with the government in order to receive financial benefits, including "services" and "subsistence."[17]  On redirect, she explained that the government placed her in a hotel for her safety and covered her travel expenses from the hotel to her job.

---

[16] Ms. Malloy testified in front of a grand jury that appellant sent the threat in a text message, but that she had deleted the specific text.  At trial, the government elicited testimony from Ms. Malloy that she had testified at the grand jury based on her memory, and that she had several forms of contact with appellant, including phone, text, and in person.

[17] Defense counsel tried to impeach Ms. Malloy's credibility with this line of questioning.  He suggested that Ms. Malloy had been trying to move away from the

It is well established that "[e]vidence that a defendant made threats to witnesses against him in a criminal proceeding is relevant to show the defendant's consciousness of guilt." *Haney v. United States*, 41 A.3d 1227, 1230-31 (D.C. 2012) (internal citations and quotations omitted). However, the "admissibility of such evidence has its limits, for it has great potential for prejudice to the accused." *Id*. at 1231 (internal citations and quotations omitted). Accordingly, "this court and others have been alert to perceive serious prejudice from threats evidence when the context does not clearly warrant its admission." *Id*.

Threat evidence is admissible if it is being used to rehabilitate a witness after their credibility has been impeached. *See Mercer v. United States*, 724 A.2d 1176, 1181, 1193 (D.C. 1999). In *Mercer*, defense counsel sought to impeach a witness by suggesting that her motivation for entering the witness protection program was to get paid by the government. *Id*. at 1193. In response, the prosecution was allowed

---

Parkchester Apartments for years because it was "not the best of communities" and faced "financial pressure" to give her children nice things. At closing argument, he asserted that "from the moment [Ms. Malloy] cooperated she's been treated like a queen." He also returned to the theory that Ms. Malloy was desperate to get out of Parkchester, rhetorically asking "[y]ou don't think she's been trying to get out of that neighborhood for the last 16 years?"

to rehabilitate the witness by presenting evidence of an alleged threat in order to demonstrate that the witness's true motivation for entering the program was fear. *Id.*

Here, the trial court's admission of the threat evidence was consistent with *Mercer* and *Haney*. The trial court considered the context of the threat evidence before allowing its admission, and found that it was being used to rebut the suggestions that Ms. Malloy was cooperating for financial gain. The trial court found that this context "clearly warrant[ed] its admission." *Haney*, 41 A.3d at 1231. Similar to the situation in *Mercer*, appellant repeatedly suggested that Ms. Malloy was biased toward the government because prosecutors were offering her cash and other benefits. It was thus fair to give the government a chance to explain that Ms. Malloy was merely receiving assistance in order to keep her safe after being threatened by appellant. Therefore, we see no error in the trial court's ruling on this issue.

## G.    Resentencing and Amended Judgment

Finally, appellant argues that he is entitled to resentencing and an amended judgment. Appellant contends, and the government concedes, that one of his murder convictions should be vacated and two of his PFCV convictions should merge into

the third.  We agree.  "When there is only one killing, the defendant may not be convicted of more than one murder." *Jackson v. United States*, 750 A.2d 551, 552 (D.C. 2000) (internal quotations and citations omitted).  Additionally, multiple counts of PFCV merge when only one gun was used and the incidents were not separated by time and location.  *Nixon v. United States*, 730 A.2d 145, 153 (D.C. 1999), *cert. denied*, 528 U.S. 899 (1999).  Here, there was only one decedent and the shooting took place within a few seconds in one location.  Therefore, we remand to the trial court to vacate one second-degree murder conviction and two of the PFCV convictions.

Appellant also argues that his written judgment improperly imposed a mandatory minimum term of 120 months' imprisonment, whereas the judge orally imposed 60 months' mandatory minimum.  At sentencing, the trial court imposed a sentence of 324 months' imprisonment for the second-degree murder while armed offenses, to run concurrently with 60 months for the related PFCV charges.  Consecutive to those sentences, he imposed 120 months for AWIKA and 60 more months for the related offense of PFCV, to run concurrently to one another.  After discussing the AWIKA and related PFCV counts, he stated, "[T]here's a mandatory minimum associated with the firearms violation and the while armed pieces of the

sentence, total of 60 months of mandatory minimum time."[18] Appellant argues that this clearly demonstrates the trial court's intention to impose a mandatory minimum sentence of 60 months, not 120 as reflected on the written judgment. The government counters that the oral mandatory minimum pronouncement is ambiguous, so the "rule giving primacy to the oral version of the sentence" does not apply. *See Gray v. United States*, 585 A.2d 164, 166 (D.C. 1991) (oral sentence is only given primacy when it is "clear and unambiguous"). Further, the government notes that there is also a 60-month mandatory minimum for committing a crime of violence, or a dangerous crime, while armed.[19] Therefore, the government argues, because the judge imposed the sentences for second-degree murder while armed/PCFV and AWIKA/PCFV consecutively, the written judgment accurately reflects the total mandatory minimum of 120 months.

We agree that the trial court's oral sentence was ambiguous. While the trial judge stated the mandatory minimum was a "total" of 60 months, he also stated that there was a mandatory minimum for the "firearms violation *and* the while armed pieces." Therefore, it is possible that he was acknowledging the 60-month

---

[18] The mandatory minimum sentence for PFCV is five years or 60 months. *See* D.C. Code § 22-4504(b).

[19] *See* D.C. Code § 22-4502(a)(1).

mandatory minimum that attached to *each* the "firearms violation *and* the while armed pieces of the sentence." Based on this interpretation, it follows that the mandatory minimum sentence is 120 months: 60 months for PFCV ("firearms violation") that runs concurrent with second-degree murder while armed, and an additional 60 months for AWIKA (a "while armed" piece).[20]

However, because we vacate appellant's AWIKA conviction and one of the second-degree murder convictions, and merge two of the PFCV convictions, appellant is left with one second-degree murder conviction and one PFCV conviction. While these convictions both have a mandatory-minimum of 60 months, the judge imposed concurrent sentences for them, and as a result, the judgment should reflect a mandatory minimum sentence of 60 months. We therefore remand to the trial court for resentencing in accordance with this opinion.

---

[20] This also makes sense if the trial court imposed the first mandatory minimum of 60 months for second-degree murder while armed ("while armed" piece) and the second 60 months for PFCV associated with AWIKA ("firearms violation").

### III.  Conclusion

Accordingly, we vacate appellant's AWIKA conviction because we hold that the doctrine of transferred intent is inapplicable to sustain a conviction of AWIKA when there is no physical injury to an unintended victim.  Applying transferred intent in the instant case would be a significant departure from the origins of the doctrine, which developed to ensure a defendant would not escape liability for the most extreme form of harm.  Additionally, we affirm one of appellant's second-degree murder convictions and one of his PFCV convictions, but we vacate his other second-degree murder conviction and PFCV convictions, and remand for the trial court to correct the sentencing issue.

*So ordered.*

MCLEESE, *Associate Judge*, concurring in part and dissenting in part:  I join the opinion of the court except to the extent that the court holds that the evidence was insufficient to support Mr. Gordon's conviction for assaulting Ms. Morris with intent to kill John Doe while armed.  On that issue, I respectfully dissent.

## I. Factual Background

Viewed in the light most favorable to the jury's verdict, the pertinent evidence at trial was as follows. Mr. Gordon fired six shots in the direction of two people: Gabriel Turner and an unknown person referred to at trial as John Doe. One of the bullets hit and killed Mr. Turner. It appears that none of the bullets hit John Doe. Two of the bullets entered Ms. Morris's apartment, which was approximately 100-150 yards away from the location of the shooting. One bullet shattered Ms. Morris's living-room window and the other shattered Ms. Morris's bedroom window. "[G]lass was everywhere," and one of the bullets would have hit Ms. Morris if she had not just lain down. The incident terrified Ms. Morris.

## II. Analysis

### A. Statutory Interpretation of D.C. Code § 22-401

D.C. Code § 22-401 prohibits "assault with intent to kill" (AWIK). Mr. Gordon has not disputed in this court that the evidence was sufficient to establish that he assaulted Ms. Morris and that he intended to kill John Doe. The question is

whether § 22-401 requires that the victim of the assault be the person whom the defendant intended to kill. I conclude that this court has already answered that question in the negative and that we are bound by that prior holding.

Section 22-401 prohibits not only AWIK but also assault with intent to commit various other offenses, including robbery. D.C. Code § 22-401. In *Moore v. United States*, 508 A.2d 924 (D.C. 1986) (per curiam), this court considered whether § 22-401 (then codified at D.C. Code § 22-501) "requires that the person assaulted must be the same person the assailant intended to rob." 508 A.2d at 925. We treated that issue as one of statutory interpretation, and we made no mention of the doctrine of transferred intent. *Id.* at 925-26. We indicated that "the statute in question does not specify that the intent to rob be directed at the person assaulted." *Id.* at 926 (internal quotation marks omitted). Relying on "common sense" and choosing to "[g]iv[e] the language of our statute its full meaning," we concluded that "it would be nonsensical to limit [the statute's] scope to situations involving a single victim." *Id.* In explaining that conclusion, we emphasized the statute's "major . . . purpose, to punish an assailant whose criminal conduct potentially exposes the assault victim to a greater risk of harm because the assault is accompanied by an intent to commit another offense." *Id.*

I understand *Moore* to adopt a simple, uniform rule: as a matter of statutory interpretation, § 22-401 does not require that the victim of the assault also be the person whom the defendant intends to rob or kill or poison, etc. Thus, there is no need for the "common law doctrine of transferred intent." *Brooks v. United States*, 655 A.2d 844, 846 (D.C. 1995). That is why *Moore* did not mention transferred intent.

The court commented in *Moore* that it would be "particularly" nonsensical to limit the statute's scope in cases "where the assault on one victim is used to effectuate the robbery of another at the scene." 508 A.2d at 926. I do not view that comment as a qualification of the court's unequivocal rejection of a single-victim requirement under § 22-401 as "nonsensical." *Id.* That rejection is not undermined or limited, in my view, by the court's passing comment that such a requirement would be *particularly* nonsensical in certain circumstances.

The court in this case, however, appears to limit *Moore*'s application to the circumstances that the *Moore* court viewed as particularly nonsensical. *Supra* at 18. I disagree with that reading of *Moore* for two reasons. First, limiting *Moore* in that way seems contrary to *Moore*'s unequivocal statement of its holding. Second, that reading of *Moore* seems contrary to *Moore*'s stated rationale: fulfilling § 22-401's

"major . . . purpose, to punish an assailant whose criminal conduct potentially exposes the assault victim to a greater risk of harm because the assault is accompanied by an intent to commit another offense." 508 A.2d at 926. Limiting the provision to cases in which an assault is "used to effectuate" another crime would not fulfill that purpose, as the present case illustrates. The assault on Ms. Morris was not "used to effectuate" the assault with intent to kill John Doe. Nevertheless, Ms. Morris was actually (not just "potentially") exposed to a greater risk of harm because Mr. Gordon's attack on John Doe was accompanied by an intent to kill. That intent doubtless was what led Mr. Gordon to shoot a deadly weapon and nearly hit Ms. Morris.

In sum, I conclude that *Moore* precludes the court's holding that § 22-401 is inapplicable to cases in which a defendant assaults (but does not physically injure) a victim through acts intended to kill a different victim. I therefore would hold that the evidence was sufficient to support Mr. Gordon's conviction for assaulting Ms. Morris with the intent to kill John Doe.

## B. Transferred Intent

Although I would affirm without relying on the doctrine of transferred intent, I note that I disagree in a number of respects with the court's discussion of that doctrine.

### 1. Binding Precedent

The court concludes that no binding precedent answers the question whether transferred intent applies to support an AWIK conviction where the victim was not an intended target and was not physically injured. *Supra* at 12-18. To the contrary, however, we have already upheld an AWIK conviction in precisely those circumstances.

In *Dockery v. United States*, 853 A.2d 687 (D.C. 2004), the defendant "question[ed] whether an individual who is not a target of the shooting and is not actually shot is the victim of an assault with intent to kill while armed." *Id.* at 699 n.11 (brackets and internal quotation marks omitted). We noted that the defendant had not raised that argument in the trial court, but — contrary to the suggestion of

the court in this case, *supra* at 16 n.5 — we did not rely on that fact to resolve the defendant's claim. *Id.* Rather, we upheld the AWIK conviction on the merits, stating that "this court has answered that question affirmatively." *Id.* In my view, *Dockery* squarely holds that transferred intent can apply to support an AWIK conviction where the victim was unintended and was not physically injured.

The court states that *Dockery* is not binding precedent because *Dockery* did not independently analyze the issue, instead erroneously concluding that the issue had already been decided by this court. *Supra* at 16 n.5. The court's description of the opinion in *Dockery* appears to be accurate, but it also seems to me to be irrelevant. We are bound by *Dockery* even if *Dockery* rested on an incorrect premise and even if *Dockery*'s analysis was incomplete. *See, e.g.*, *Galberth v. United States*, 590 A.2d 990, 991 n.1 (D.C. 1991) ("Even if . . . [a prior decision] relied on a mistaken analysis, we are bound by the prior decision in the absence of a change in governing law."); *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) ("[N]o division of this court will overrule a prior decision of this court . . . .") (footnote omitted); *Mullin v. Brown*, 115 P.3d 139, 143 (Ariz. Ct. App. 2005) ("This court may not disregard a clear holding . . . on the purported ground that the analysis supporting it is incomplete.") (internal quotation marks omitted). The court in this case also states that *Dockery* is not a holding because "the judicial mind was not focused on the issue

we now confront." *Supra* at 16 n.5 (internal quotation marks omitted). I disagree. The judicial mind was focused on the precise issue we confront and expressly decided that issue. The problem is that the judicial mind appears to have committed a legal error in deciding the issue. In my view, that is not a basis upon which this court can depart from the holding of *Dockery*.

## 2. Necessity

At several points, the court suggests that transferred intent is a doctrine of necessity, applicable only if the doctrine is needed to ensure that a defendant is "punished for a crime of the same seriousness as the one [the defendant] undertook to commit." *Supra* at 22 (internal quotation marks omitted); *see also id.* at 19, 22-23. I do not doubt that the doctrine has its historical roots in that concern. This court, however, has not limited the doctrine to that concern. For example, in *Lloyd v. United States*, 806 A.2d 1243 (D.C. 2002), the defendants were each convicted of two counts of murder, one for their intended victim and the other, on a theory of transferred intent, for an unintended victim. *Id.* at 1244-46. The defendants argued that the doctrine of transferred intent was "unnecessary," because the intended crime of murder had actually been committed against the intended target. *Id.* at 1246. After an extensive discussion, this court disagreed. *Id.* at 1247-51. In explaining its

conclusion, the court quoted the following passage with approval: "Human beings are not fungible. Therefore, a separate injury to each constitutes a separate crime, and the law does not give the defendant a discount on the second and subsequent victims of [the defendant's] intentional conduct." *Id.* at 1249-50 (internal quotation marks omitted). *Lloyd* also explained that our earlier decision in *Moore* was an "obstacle" to the defendants' argument, "because in that case the specific intent to commit a crime was realized against the intended victim, and yet we held that it could also provide the mental element for an assault against the unintended victim." *Id.* at 1248.

In my view, the court errs by limiting the doctrine of transferred intent based on a concept of necessity that is contrary to this court's law of transferred intent.

### 3. Maryland Case Law

The court's opinion relies heavily on Maryland case law. *Supra* at 18-22. I see no need to consider Maryland law, given the binding authority in this court on the precise issue before us. Even leaving that point aside, however, reliance on Maryland law seems unwarranted, because Maryland's law of transferred intent is fundamentally inconsistent with ours. For example, *Harvey v. State*, (Md. Ct. Spec.

App. 1996), on which the court in this case primarily relies, focuses on the concept of necessity and holds that the doctrine of transferred intent is limited to homicide cases. *Id.* at 634-44. As I have just noted, however, this court does not limit the doctrine of transferred intent to situations of "necessity." *Supra* at 58. Moreover, this court has repeatedly applied the doctrine of transferred intent to non-homicide offenses. In addition to *Dockery*, discussed above, *see, e.g.*, *Hagans v. United States*, 96 A.3d 1, 43 (D.C. 2014) ("[T]he doctrine of transferred intent . . . allowed appellants to be held liable for the . . . wounding of Flores-Bonilla even though the appellants intended to kill Madhis."); *In re E.D.P.*, 573 A.2d 1307, 1308 (D.C. 1990) ("Under the doctrine of transferred intent, the trial judge could find that where a person attempts to injure one person (W.F.), but injures another by mistake (the three juvenile supervisors), the intent of the defendant will be transferred from the intended victim (W.F.) to the actual, unintended victim (the three juvenile supervisors)."). In my view, the court in this case errs by basing its holding on the reasoning of a Maryland decision that is incompatible with our law.

There is a second problem with the court's reliance on *Harvey*. *Harvey*'s analysis rests on the theory that a victim who is assaulted but not physically injured is "not harmed." 681 A.2d at 639 (internal quotation marks omitted). As the court in this case acknowledges (*supra* at 25), however, assault harms a person even if the

person is not physically injured. "[S]imple assault . . . is designed to protect not only against physical injury, but against all forms of offensive touching, and even the mere threat of such touching." *Comber v. United States*, 584 A.2d 26, 50 (D.C. 1990) (en banc) (emphasis and internal citations omitted); William L. Prosser, *Law of Torts* § 10 at 37-38 (4th ed. 1971) ("The interest in freedom from apprehension of a harmful or offensive contact with the person, as distinguished from the contact itself, is protected by an action for the tort known as assault. . . . [T]he plaintiff is protected against a purely mental disturbance of [the person's] integrity. This action . . . is the first recognition of a mental, as distinct from a physical, injury. There is a touching of the mind, if not of the body. The explanation of its early appearance lies in the obvious likelihood that assaults will result in breaches of the peace . . . .") (footnote and internal quotation marks omitted). That is why assault is a tort and, in this jurisdiction and many others, a crime, even if the victim has not been physically injured.

Thus, the relevant issue is not whether the unintended assault victim is physically injured. Rather, the relevant issue, as this court's cases have framed it, is whether the defendant's "criminal conduct potentially exposes the assault victim to a greater risk of harm because the assault is accompanied by an intent to commit another offense." *Lloyd*, 806 A.2d at 1248 (internal quotation marks omitted). The

shots Mr. Gordon fired indisputably exposed Ms. Morris to a great risk of harm, and they indisputably harmed Ms. Morris, even though Ms. Morris luckily was not physically injured or killed.

There is a third, related problem with the court's reliance on *Harvey*. The court endorses *Harvey*'s view that it would be "absurd" for a defendant to be criminally liable with respect to unintended victims who are in harm's way but are not physically injured. *Supra* at 20 (quoting *Harvey*, 681 A.2d at 639). That endorsement contradicts the court's statement that the court "take[s] for granted" that Mr. Gordon assaulted Ms. Morris, *supra* at 11 n.3, because Ms. Morris was an unintended victim who was not physically injured. The court cannot both take for granted that Mr. Gordon is guilty of assaulting Ms. Morris and endorse the view it would be absurd to conclude that Mr. Gordon assaulted Ms. Morris.

### 4. Policy concerns

Finally, the court relies on two perceived policy concerns. *Supra* at 22-24. Given our binding precedent, I do not view those policy concerns as relevant to the disposition of this case. I do, however, disagree with the court's policy discussion in several respects.

### a. Administrability

The court raises a question of administrability: how should courts go about determining when intent to kill is properly transferred to unintended victims who are not physically injured? *Supra* at 22. In my view, that is not a difficult question. As I have already explained, the AWIK statute always permits the intent to kill to be directed at someone other than the assault victim. *Supra* at 53-54. Thus, there is no need to transfer intent.

Even if the issue is instead analyzed under the doctrine of transferred intent, intent to kill is properly transferred, in my view, whether or not the victim was physically injured or an unintended victim. *Supra* at 55. I leave open the question whether transferred intent would be permissible if the danger to victim was entirely unforeseeable. *See Lloyd*, 806 A.2d at 1249 n.5 (leaving that issue open). Shooting a firearm repeatedly in a residential area obviously poses a foreseeable risk of injury to nearby residents, and Mr. Gordon has not suggested otherwise.

In my view, the harder question is determining when an unintended victim who was not injured is properly understood to have been the victim of an assault.

That harder question, however, will need to be decided whether or not intent to kill can be transferred for purposes of AWIK.

### b. Overly Expansive Criminal Liability

The court also expresses concern that applying the AWIK statute to unintended victims who are not physically harmed would result in overly expansive criminal liability. *Supra* at 23-25. If this were an open question, I would agree that the court raises a valid concern. I do think, however, that the concern is somewhat overstated.

First, the court acknowledges that the doctrine of concurrent intent can permit AWIK liability in cases involving unintended victims who are not physically injured. *Supra* at 24 n.10. The court accurately notes that this doctrine has been limited to cases in which risk to the victim was foreseeable. *Id.* As previously noted, however, the same may well be true of the doctrine of transferred intent. *Lloyd*, 806 A.2d at 1249 n.5 (leaving that issue open). The court suggests that a requirement of foreseeability would not be "a meaningful limitation," *supra* at 23, but the court does not explain why that requirement is more meaningful in the context of concurrent intent than in the context of transferred intent. The court's opinion thus leaves

entirely unclear to what extent, if any, applying the doctrine of transferred intent to unintended victims who are not physically injured would lead to broader liability than is concededly available under the doctrine of concurrent intent.

Second, the court says that it is taking for granted that Mr. Gordon assaulted Ms. Morris, *supra* at 12 n.3. That assault was with a dangerous weapon, so the court is assuming that Mr. Gordon in any event committed a felony against Ms. Morris that is punishable by up to ten years of imprisonment. D.C. Code § 22-402.

Third, as the court essentially acknowledges, *supra* at 23 n.8, the doctrine of merger would in some circumstances operate to preclude multiple AWIK convictions in cases involving unintended and victims who are not physically injured. *Compare, e.g.*, *Ruffin v. United States*, 642 A.2d 1288, 1296 n.14 (D.C. 1994) ("[S]ingle assaultive acts directed at a group of individuals ([physically] injuring none of them) have been found to give rise to only one count of assault."), *with, e.g.*, *Graure v. United States*, 18 A.3d 743, 761-66 (D.C. 2011) (permitting multiple convictions for assault with dangerous weapon where defendant set fire that placed multiple victims in path of physical injury).

Fourth, if the trial court concludes that a separate term of incarceration is unwarranted in a case involving an unintended victim who is not physically injured, the trial court will typically have the option of imposing a sentence for that offense that runs concurrently with other sentences. The trial court in this case imposed a concurrent sentence on Mr. Gordon's conviction for assaulting Ms. Morris with the intent to kill John Doe.

In any event, binding authority establishes that the AWIK statute applies to cases in which a defendant intends to kill one person and assaults another without physically injuring that other person. This court has explained the rationale for the legislature's decision to treat such conduct as a serious offense: "to punish an assailant whose criminal conduct potentially exposes the assault victim to a greater risk of harm because the assault is accompanied by an intent to commit another offense." *Moore*, 508 A.2d at 926. I believe that we are required to abide by that legislative determination.

For the foregoing reasons, I respectfully dissent from the court's holding that the evidence was insufficient to support Mr. Gordon's conviction for assaulting Ms. Morris with intent to kill John Doe while armed.